Labamoke, Judge,
delivered the opinion of the court:
This is a suit for refund of income and excess profits taxes for the years 1943,1944, and 1947.
The taxpayer corporation is engaged primarily in the operation of a motor bus and trackless trolley system in the City of Memphis, Tennessee. Prior to 1945, taxpayer operated an electric street railway system in Memphis, but this operation was abandoned in 1945, 1946, and 1947. As a result of this abandonment the taxpayer incurred an obvious loss. The Internal Revenue Service recognized that a loss occurred and allowed abandonment losses for the years 1945, 1946, and 1947. There is no dispute as to the method used in determining the amount of the loss recognized, but there exists a dispute as to the amount. The basis for the dispute is the difference of opinion as to the cost of taxpayer’s property as of December 31, 1912. The defendant contends that this cost was $9,843,000, which is equivalent to $9,343,000 of plaintiff’s bonds outstanding, plus $500,000 in cash originally paid on common stock when the company was organized. The plaintiff contends that this amount should be increased by the 1905 fair market value of 25,000 shares of its common stock which it is claimed was paid on December 18, 1905 as part consideration for the acquisition of property received by it from the Memphis Street Railway Extension Company (hereinafter sometimes referred to as the Extension Company) . Therefore, other factors being constant, an increase in the cost of the plaintiff’s property would naturally result in a greater loss when that property was abandoned. It would, in addition, increase taxpayer’s equity invested capital which is a figure used in determining excess profits.
To resolve this dispute, we must determine whether plaintiff issued the 25,000 shares of stock as part consideration for property received by it.
*800 In February of 1905 the Extension Company received a franchise to operate and maintain a street railway system over certain streets in Memphis. The lines were to be extensions of the plaintiff’s then existing lines. The Extension Company maintained its own corporate minutes, stock certificate books and books of account. The Extension Company held directors’ meetings, purchased materials and borrowed money. As of December 18,1905, it had assets of $700,000. However, as of that date the Extension Company had realized no receipts from operations. On that date 495 shares of the Extension Company’s 500 shares outstanding were held by Isidore Newman & Sons. Similarly, of plaintiff’s 5,000 shares outstanding, 4,989 shares were held by the same Isidore Newman & Sons. On December 18, 1905, the Extension Company entered into a contract with plaintiff whereby it agreed to sell to plaintiff all its property. The purchase price agreed upon was 25,000 shares of plaintiff’s common stock (par value of $2,500,000) and $700,000 in five percent gold bonds. Before entering into the contract, plaintiff had no outstanding preferred stock and only 5,000 shares of common stock. Plaintiff’s stockholders, on December 18, 1905, authorized 25,000 shares of preferred stock to be given to the holders of the old common stock and that the old common stock be retired. They further authorized the issuance of 25,000 shares of new common stock which was to be given to the Extension Company. It is the transfer of this stock that gives rise to the principal part of the present controversy.
The first overall question presented by this case is: Did the taxpayer acquire property for its stock in an arm’s length transaction in 1905, when it paid $700,000 in bonds for property of Memphis Street Eailway Extension Company, having a tangible value of no more than $700,000, and in addition issued 25,000 shares of common stock having a par value of $2,500,000 to an affiliate or alter ego of the person owning approximately 99 percent of its stock?
The resolution of two legal questions depends on the answer to the first overall question: (1) whether the taxpayer’s equity invested capital should be greater than that allowed by the Commissioner of Internal Revenue in com *801 puting taxpayer’s excess profits tax for the period April 1, 1943 to December 31, 1943, and for the calendar year 1944; (2) whether taxpayer sustained a greater loss than allowed by the Commissioner of Internal Revenue as a result of the abandonment of its street railway lines in 1945, 1946, and 1947.
The solution of the first overall question lies in the facts of this case. The evidence shows, and the commissioner has found, which finding we adopt, that no satisfactory evidence is presented that the 25,000 shares of plaintiff’s common stock issued to the Extension Company were truly a part of the consideration for the assets acquired by plaintiff through an indenture and conveyance by the Extension Company to the plaintiff dated December 18, 1905 (finding 26).
This court said in Republic Steel Corp. v. United States, 141 Ct. Cl. 499, 503:
* * * However, the declared purpose of the parties is not necessarily controlling. Of more significance is what the parties actually did. Thus, substance, and not form, governs in this type of controversy. Weiss v. Stearn, 265 U.S. 242.
Therefore, this court will not permit the corporate image to serve as blinders when it seeks to answer the question as to what actually occurred here, but will look at the facts in each situation. The pertinent facts in the instant case may be summarized as follows:
The stockholders were the same. The taxpayer had never established an evaluation of its franchise on its own books, and there is no evidence that the plaintiff had established or determined any value for the franchise acquired from the Extension Company on December 18, 1905. There is no evidence that plaintiff’s earnings were sufficiently increased after the acquisition of the additional franchise and other assets of the Extension Company whereby a reasonable determination of value of such franchise might be made. The Extension Company had not fully developed its franchise and had never operated any part of it, nor is there evidence that the Extension Company ever intended to operate its franchise or that it could have operated profitably, except as an adjunct to plaintiff’s system. Therefore, the plaintiff *802 has totally failed to sustain its burden to prove the value that could be reasonably ascribed to the franchise in excess of $700,000. Finally, the facts show that the $700,000 of five percent bonds issued by plaintiff as of October 18, 1905, represented the fair and reasonable net value of all the assets acquired by the plaintiff from the Extension Company, and that no consideration can be reasonably attributable to the 25,000 shares of its common stock as a part of the consideration of such assets, as set forth in the proposed agreement of December 18, 1905 by the Extension Company.
In short, the two corporations were owned by the same interest. The $700,000 of improvements to taxpayer’s lines were transferred to taxpayer when completed, and in the course of this transfer 25,000 shares of taxpayer’s common stock were issued to Isidore Newman & Sons.
It follows as a necessary result of our determination that the plaintiff’s equity invested capital should not be increased by any value ascribed to the 25,000 shares of common stock and that taxpayer did not sustain a loss greater than that allowed by the Commissioner of Internal Kevenue. This is so because both parties agree as to the method of computation and the total cost of plaintiff’s tangible property, leaving as the only dispute the question as to whether the value of the 25,000 shares should be added to plaintiff’s cost on December 31, 1912. Since we hold that the value of the 25,000 shares should not be added to plaintiff’s cost, it follows that the cost attributable to intangibles as determined by the Commissioner was correct.
In the light of the facts above recited, but one conclusion can be reached — that taxpayer’s equity invested capital used in computing its excess profits tax and taxpayer’s obsolescence loss was correctly computed by the Commissioner of Internal Revenue.[1] Consequently, plaintiff cannot recover on this item of its claim.
The second and final question presented involves plaintiff’s claim that its earnings and profits as of the close of the years 1943 and 1944 should be recomputed so as to reflect the income and excess profits tax liabilities found to be owing by plaintiff for these years. This, plaintiff asserts, *803 should be clone by taking into account the effect upon such liabilities of the adjustment which would be applicable to these years by applying the net operating loss and unused excess profits credit carrybacks for the years 1945 and 1946. The result of this would be an increase in accumulated earnings and profits existing at the beginning of 1944 and 1945, which in turn would increase the excess profits credits for 1944 and 1945, thus reducing the adjusted excess profits net income subject to tax for these years.
Despite an Internal Revenue ruling[2] which expressly bars such a result, plaintiff seeks such an adjustment on the general rule that with regard to earnings and profits the amount thereof should reflect the corporation’s true financial condition as of the end of the taxable year, regardless of whether or not all of the events and determinations have occurred at that time. Plaintiff cites several cases, principally Stern Brothers & Co., 16 T.C. 295 (1951), which have applied this rule. However, the cases cited dealt with disputed tax liabilities which arose for the very year for which the earnings and profits were sought to be recomputed and none involved the situation here; i.e., of applying to prior years tax consequences which arose in subsequent years.
Defendant relies on the Supreme Court decision in Lewyt Corporation v. Commissioner, 349 U.S. 237 (1955) in opposition to plaintiff’s claim. There it was held that for the purpose of computing a net operating loss carryback from 1946 to 1944 and hence to 1945, the excess profits tax deductible for 1944 was such excess profits tax as computed without giving effect to the allowance of the net operating loss carryback. Plaintiff seeks to distinguish that holding from the situation here on the ground that what was involved in Lewyt was the computation of a net operating loss carryback rather than the computation of earnings and profits, and that since the latter are basic to the determination of the real financial condition of a corporation they must be computed with regard to events and determinations which occur in subsequent years.
However, as pointed out above, the theory which plaintiff seeks to apply and the cases relied on in support thereof deal *804 with, situations or events which arose prior to or at the close of the taxable year in question, with only the settlement of the dispute which they gave rise to being determined in a subsequent year. This, of course, is not the situation here where the adjustment or carryback which is sought to be applied is dependent upon facts which relate not to the taxable year but some later year.
The adjustment which plaintiff urges here is, of course, not in conformity with the general rule of tax reporting when the taxpayer is on the accrual method. The holding of the Stern Brothers case, supra, and the cases which have followed it are recognized as providing an exception to this general rule. The exception in the Stern Brothers case, supra, is applicable where it is conceivable that the full tax could have been determined and paid in the taxable year. This would be impossible in the case at bar. Plaintiff has received the benefit intended by the net operating loss and unused excess profits credit carrybacks. Such a further extension as plaintiff requests is barred by the Internal Revenue ruling cited above and we believe would be contra to the rationale of the Lewyt decision, supra.
Plaintiff is not entitled to recover, and its petition will be dismissed.
It is so ordered.
Duefee, Judge; Whitaker, Judge; and JoNes, Chief Judge, concur.
BINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Marion T. Bennett, and the briefs and argument of counsel, makes findings of fact as follows:
I. The taxpayer corporation, Memphis Transit Company, is a corporation duly organized and existing under the laws of the State of Tennessee, having been incorporated on March 28, 1895. The present name was adopted on March 21, 1958. The taxpayer is engaged primarily in the operation of a motor bus and trackless trolley system in the city of Memphis. Prior to 1945 the taxpayer operated an electric street railway system in the city of Memphis. The latter operation was abandoned in 1945, 1946 and 1947.
*805 2. Plaintiff filed with the Collector of Internal Revenue, Nashville, Tennesse, timely corporation income and excess profits tax returns for the period April 1, 1948 to December 31, 1948, and for the calendar year 1944 and a timely income tax return for the calendar year 1947.
Plaintiff paid income and excess profits taxes and later received refunds of a part of such taxes in the amounts set forth in this finding. Plaintiff filed timely refund claims for the amounts set forth below or, in the alternative, for such greater amounts as are legally refundable.
Period April 1,1943 to December 31,1943

Calendar Year 1944

Calendar Year 1947

The timely claims for refund of income and excess profits tax for the periods April 1, 1943 to December 31, 1943, and for the calendar years 1944 and 1941 as listed above were rejected by the Commissioner of Internal Revenue by registered mail on or about April 24,1951.
3. Plaintiff claims refunds of income and excess profits taxes previously paid for the period April 1,1943 to Decern- *806 ber 81, 1943, and for the year 1944, and income tax for the year 1947 on the ground that plaintiff is entitled to:
(a) losses incurred by plaintiff in 1945, 1946 and 1947 in the abandonment of its street railway system not heretofore allowed to plaintiff;
(b) increases in carrybacks of net operating losses from the year 1945 to the period April 1, 1943 to December 31, 1943, and thereafter to 1944 and from the year 1946 to 1944 as caused by the additional abandonment losses claimed by plaintiff;
(c) inclusions in plaintiff’s invested capital of an amount equal to the fair market value of plaintiff’s common stock issued for property on December 18, 1905, for the purpose of computing plaintiff’s excess profits tax liability for the period April 1, 1943 to December 31, 1943, and the calendar year 1944 and as increasing the excess profits credit carry-backs to the extent allowable from 1945 to the period April 1, 1943 to December 31, 1943, and thereafter to 1944 and from 1946 to 1944. No value for said stock has heretofore been included in plaintiff’s invested capital;
(d) increases in plaintiff’s excess profits credits brought about by computing plaintiff’s earnings and profits as of December 31, 1943, and as of December 31, 1944, after reducing income and excess profits taxes for the period April 1,1943 to December 31,1943, and for the calendar year 1944 by giving effect to carrybacks of net operating losses and unused excess profits credits from the years 1945 and 1946. Such reduction of these tax liabilities increases plaintiff’s earnings and profits and therefore its equity invested capital and, consequently, reduces its excess profits tax liability for the period April 1, 1943 to December 31, 1943, and for the calendar year 1944. No reduction of these tax liabilities as a consequence of giving effect to net operating loss and excess profits credit carrybacks has heretofore been allowed.
4. Plaintiff’s books of account have been maintained and its tax returns have been filed for all the periods here involved on an accrual basis.
For the period January 1, 1943 to March 31, 1943, plaintiff’s return was included in the consolidated return filed by the National Power & Light Company and subsidiary companies. No issue is here presented as to such return.
*807 Plaintiff’s returns for the years 1945 and 1946 as audited by the Internal Revenue Service disclosed a net loss as to each year. The years 1945 and 1946 are relevant to the issues here involved in that the net operating loss and unused excess profits credit carrybacks from said years to the 1943 period and year 1944 are affected by the questions here to be decided.
5.As a result of examinations by revenue agents, the Internal Revenue Service redetermined plaintiff’s income and excess profits tax liability for the 1943 period and calendar years 1944 and 1947. As part of such redetermination, the Internal Revenue Service allowed as deductions the losses incurred by plaintiff as a result of abandonment of its street railway system. Said losses were allowed in the amounts and for the years as follows:
1945_$2,344,578.58
1946_ 1, 875, 662. 87
1947_ 468, 915.72
6. The abandonment losses so incurred included intangible costs found by the Internal Revenue Service as referable to the abandoned properties and therefore a part of the abandonment losses.
The intangible costs referable to the abandoned properties were determined by the Internal Revenue Service by (a) ascertaining a cost for plaintiff’s properties at December 31, 1912; (b) deducting from said cost the portion thereof applicable to physical properties at that date; (c) assigning the remainder of said cost to intangibles; (d) determining that said intangible cost remained imchanged to the years of allowance of the abandonment losses; and (e) that 75 percent thereof was attributable to the abandoned railway properties.
7. For the purpose of computing the abandonment losses in the manner described, the total cost of plaintiff’s properties was established by the Internal Revenue Service in the amount of $9,843,000. Said cost was determined as equivalent to the principal amount of plaintiff’s bonds outstanding at December 31, 1912, of $9,343,000 plus $500,000 in cash originally paid on plaintiff’s common stock upon its organization. This amount did not include any cost attributable *808 to the 23,000 shares of plaintiff’s common stock which it is stipulated were issued in part consideration for street railway properties acquired by plaintiff in 1905 from the Extension Company and which properties were included with those for which abandonment losses were allowed for 1945,1946, and 1947.
8. On or about February 22,1905, the Extension Company received a franchise from the legislative council of the city of Memphis to construct, operate and maintain a street railway system over certain streets in the city of Memphis, representing approximately 89 extensions of plaintiff’s system. Acting under the authority granted in said franchise, the Extension Company entered into an engineering contract with Ford, Bacon & Davis, as a result of which 14.9 miles of electric railway lines were constructed prior to December 18,1905, consisting of 27 extensions to plaintiff’s system. The lines so constructed connected with lines which were owned and operated by plaintiff. During this period the Extension Company also acquired cars, powerhouse equipment, carhouses, buildings, fixtures and miscellaneous equipment required for the operation of the railway lines constructed by it.
9. The Extension Company maintained its own corporate minutes, stock certificate books and books of account. It made purchases of construction materials and borrowed money for its own account. Meetings of the directors and stockholders were held. As of December 18, 1905, the books of the company showed the following balances in asset accounts :
Reconstruction_$152, 564. 34
Construction_ 496,128.73
Accounts receivable_ 756. 67
Stores _ 50,429.77
Freight and handling-- 120.49
Total_ 700,000.00
Subsidiary records showed that “reconstruction” and “construction” totaling $648,693.07 consisted of the following balances:
Engineering and superintendence_$36, 000.36
Right-of-way_ 500.00
*809 Track and roadway-$328,164.41
Electric line_ 45,222.33
Building and fixtures_ 4, 863. 05
Powerhouse equipment_ 17, 377.55
Carhouse and shops, building and fixtures_ 3,414. 87
Cars _ 105, 835.76
Electric equipment of cars_ 72,042.99
Miscellaneous equipment_ 5,802.28
Interest and discount_ 10,255.92
Miscellaneous - 1, 077.87
Office expense_ 8,829.09
Tools_ 9,306.59
Total_ 648, 693. 07
The Extension Company had no asset accounts on its books for its franchise to construct, operate and maintain street railway lines in the city of Memphis or for other intangibles. As of December 18, 1905, the Extension Company had realized no receipts from operations.
10. When the Extension Company was incorporated on or about February 21, 1905, it issued 500 shares of common stock, of which 496 were issued to W. S. McCrea who was a secretary and director of plaintiff. McCrea resigned from plaintiff’s employ on March 4, 1905. At that time he assigned his 496 shares of the Extension Company to Ford, Bacon & Davis. The other shareholders, Frank G. Jones, Robert L. Benson, James F. Meagher and Edward J. Karr also made transfers of the single, shares held by each. On December 18,1905, the Extension Company’s stock was held as follows: Isidore Newman & Sons, 495 shares; A. H. Ford, E. W. Ford, E. A. Neugass, L. K. Thompson and R. L. Crump, 1 share each.
11. On February 21, 1905, when the Extension Company was organized, the following were the stockholders of record of plaintiff:

Shares

O. K. G. Billings_3,331
Frank G. Jones_1, 666
W. S. McCrea_ 1
Robert L. Benson_ 1
O. H. Ruddock_ 1
Total 5,000
*810 On March 4, 1905, all of the outstanding shares of plaintiff’s capital stock were assigned to Isidore Newman & Sons, Trustees, by the then holders of said shares, C. K. G. Billings, 3,330 shares; Frank G. Jones, 1,666 shares; and W. S. McCrea, Robert L. Benson, James F. Meagher and E. J. Karr, 1 share each.
On December 18, 1905, the date upon which the Extension Company entered into a contract to transfer all of its properties to plaintiff, the stock of plaintiff was held in the amount of 1 share each by 11 individuals and 4,989 shares by Isidore Newman & Sons, Trustees.
12. The Extension Company entered into a contract with plaintiff on December 18, 1905, -under which it agreed to sell to plaintiff “all its property, real, personal and mixed, and its franchises, immunities, rights and privileges, with the exception of its franchise or right to be a corporation.” The transfer of these properties was to be free and clear of all indebtedness except for the outstanding liability of the Extension Company to pay $650,000 of its promissory notes held by Isidore Newman & Sons which the Extension Company agreed to pay upon receipt of the purchase price from plaintiff. The purchase price agreed upon was 25,000 shares of plaintiff’s common stock in the aggregate amount of $2,500,000 par value and $700,000 principal amount of plaintiff’s Consolidated Mortgage 5 Percent Gold Bonds. The contract was carried out according to its terms.
13. Before entering into the contract referred to above, plaintiff had no outstanding preferred stock and only 5,000 shares of common. Plaintiff’s stockholders, however, on December 18, 1905, authorized 25,000 shares of preferred stock and approved an exchange whereby the old common was retired and the holders thereof were issued 25,000 shares of the new preferred stock having a par value of $100 per share. At the same time the plaintiff’s stockholders approved the issuance of 25,000 shares of new $100 par value common stock to the Extension Company together with the $700,000 in Consolidated Mortgage 5 Percent Gold Bonds in exchange for its assets as mentioned above.
14. There is no evidence of any sales of plaintiff’s old common stock prior to its cancellation December 18, 1905, *811 and tbe newly issued common stock was not distributed until December 31,1905.
During 1906 the market price ranged from a high of $73 in January to about $63 late in the year on small trades. The Memphis Commercial Appeal quoted bid (over-the-counter) and asked prices of $71 bid and $72 asked in January to $64 bid and $66 asked in December 1906. The Commercial & Financial Chronicle of New York quoted bid and asked prices of plaintiff’s common stock from March through November 1906 at $69 bid and $69.75 asked in March to $64 asked in August 1906 and $62 bid in November. There was a gradual deterioration in price of these shares throughout the year of 1906 within a range of about $10. No sales were listed in the two newspapers quoted above.
The plaintiff’s common stock was traded on the New Orleans Stock Exchange and the bid and asked prices, as well as sales, were reported in The Daily Picayune of New Orleans. Sales during the year 1906 were consummated in 42 transactions, totaling 1,538 shares at an average price of $67.15. The largest transactions were 200 shares sold January 19, 1906, at $69.75 per share and 165 shares sold June 14, 1906, at $68.50 per share. The average bid and asked prices for the first 3 months of 1906 follow:

The fair market value of the 25,000 shares of common stock issued by plaintiff on December 18, 1905, was reasonably $1,750,000, or $70 per share.
15. One of plaintiff’s contentions in this case is that, for the purpose of ascertaining plaintiff’s obsolescence and abandonment losses for the years 1945, 1946 and 1947, the plaintiff is entitled to an additional amount of loss based on the cost to plaintiff of property acquired in exchange for the 25,000 shares of its common stock issued on December 18, 1905, in part consideration for the properties acquired from *812 the Extension Company. Defendant denies that additional loss should be allowed on this ground. To resolve this issue the parties have stipulated that if the court should find that the 25,000 shares were issued in part consideration for properties acquired from the Extension Company and if the court should find those shares had a fair market value, then:
(a) the total cost basis of plaintiff’s properties at December 31, 1912, which was found by the Internal Revenue Service to be $9,843,000 would be increased by the fair market value of the 25,000 shares of stock;
(b) the cost of that part of plaintiff’s properties attributable to intangibles would be an amount determined by deducting from the amount determined in subparagraph (a) above, the amount of $1,385,390.80, the latter being the cost of physical properties of plaintiff included in the total cost of $9,843,000;
(c) the total obsolescence losses allowed for the years 1945, 1946 and 1947 would include 75 percent of the cost attributable to intangible costs determined as stated in sub-paragraph (b) of this paragraph in lieu of the amount of intangible costs previously allowed by the Internal Revenue Service;
(d) recomputation of the obsolescence losses with respect to the abandonment of plaintiff’s street railway operations in the recomputation of plaintiff’s tax liability for the period April 1, 1943 to December 31, 1943, and the calendar years 1944 and 1947, and plaintiff’s net loss for the calendar years 1945 and 1946 would be made in accordance with the facts as determined in subparagraphs (a), (b) and (c) of this paragraph.
16. In accordance with the stipulation as set forth in the finding above, the determination of the additional abandonment losses allowable to plaintiff is explained and would be computed as here and subsequently indicated. The additional cost of $1,750,000 when added to the cost of plaintiff’s properties at December 31, 1912,[1] of $9,843,000, as *813 previously determined by the Internal Eevenue Service, establishes an adjusted total cost for said properties at that date of $11,593,000. The effect of this adjusted cost upon the amount of allowable abandonment losses may be ascertained by applying the method of calculating such loss as shown by the revenue agent’s report wherein determination of the abandonment losses was originally shown.
17. The loss with respect to the property abandoned was originally determined by the Internal Eevenue Service in an engineering study prepared by Engineer Eevenue Agent Karl Schmitt in a report dated October 23, 1946. The agent found that the cost of plaintiff’s properties, both tangible and intangible, as. of December 12, 1912, was $9,843,000 which was equivalent to the sum of plaintiff’s then outstanding bonds and cash originally paid for plaintiff’s stock. The agent allocated the sum of $9,843,000 between tangible and intangible property as shown by the following table which is quoted from Agent Schmitt’s report:
Railway property — depreciable_ $5,739,209. 62
Electric power plant (sold in 1923):
Power plant buildings_$254, 705.94
Power plant equipment_ 615, 937.17
- 870,643.11
Non-depreeiable:
Land - 135,581.00
Right-of-way_ 26,838.00
Grading - 236,856.28
Law expenditures_ 29,424. 04
Mise, before construction begins_ 332,126.28
Total cost of non-depreeiable property - (760,825.60) [2] 775, 538.07
Total cost of classified property_ 7,385, 390. 80
Cash cost or equivalent of property 12/31/12_ 9,843, 000. 00
Total classified cost_ 7,385,390.80
Cost attributable to intangibles_ 2,457, 609.20
Upon ascertaining the cost attributable to intangibles in the sum of $2,457,609.20 as shown, the agent made a further *814 determination that 75 percent of said intangible cost, or $1,843,206.90, was attributable to the abandoned properties at December 31,1944.
Revenue Agent Schmitt determined the cost of plaintiff’s property on hand December 31, 1944, for which abandonment losses would be allowed in the years 1945, 1946 and 1947, as set forth in the following table and quoted from his report:
Bailway property to be removed:
Depreciable property-$4, 000,069.97
Non-depreciables classified_ 384,730.17
Intangible cost (75 percent)- 1, 843,206.90
Total cost of properties_ 6,228, 007. 04
Less depreciation reserve_ 1,941,372.67
Cost remaining at December 31,1944_ 4,286,634.87
Revenue Agent Schmitt stated that the above amount was subject to adjustment to reflect removal and paving costs less salvage. It has been stipulated by the parties that no part of the intangible costs included in “railway property to be removed” had been allowed as a deduction for Federal income tax purposes prior to December 31, 1944, either by way of depreciation, amortization or otherwise. It has been further stipulated by the parties that there was no change in intangible costs during the period December 31, 1912 to December 31,1944.
18. The loss as computed by Revenue Agent Schmitt was adjusted by the Internal Revenue Service on audit of plaintiff’s tax returns for the period April 1, 1943 to December 31, 1943, and for the calendar years 1944, 1945, 1946 and 1947 in determining the amount of the obsolescence and abandonment losses to be allowed. The following adjustment is taken from the examining agent’s report dated June 20,1949, for the years 1943 through 1947 at page 67 of such report:
Value of property abandoned, net, at 12/31/44 re valuation report dated 10/23/46_ $4,286,634.37
Add removal and other related costs less salvage re-covered_ 546, 882.71
Total loss before further adjustment. 4, 833,517.08
*815 Reduction per report dated 9/13/48- $144,359.91
Total loss adjusted- 4, 689,157.17
Allocation to years:
1945 (1/2)_ $2,344,578.58
1946 (4/10)_ 1,875,662.87
1947 (1/10)_ 468,915.72
- 4, 689,157.17
The losses previously allowed by the Internal Revenue Service for the years 1945, 1946 and 1947 were the amounts allocated by the examining agent to such years as quoted above from his report, i.e., 1945, $2,344,578.58; 1946, $1,875,-662.87; and 1947, $468,915.72.
19. The amounts of losses as shown were allowed and were reflected in redetermination of plaintiff’s tax liabilities for the 1943 period and years 1944 and 1947. Amounts of additional tax or refunds, as the case may be, as a result of such redetermination were respectively paid or refunded as shown in finding 2, and the refund claims here in issue are the sole remaining claims in adjustments with respect to such liabilities.
20. Applying the method of loss determination as shown by the agents’ reports, the adjusted amounts of abandonment losses allowable for the years 1945, 1946 and 1947 are established as follows:
Corrected cost of plaintiff’s property at December 31, 1912_ $11, 593, 000. 00
Total cost of classified property as shown by agent’s report_ 7, 385, 390.80
Cost attributable to intangibles- 4, 207, 609.20
75 percent attributable to abandoned property- 3,155, 706.90
Railway property to be removed:
Depreciable property- 4, 000, 069. 97
Non-depreeiable property- 384, 730.17
Intangible cost (75%) as corrected- 3,155,706.90
Total cost of properties abandoned- 7, 540, 507. 04
Dess: depreciation reserve applicable to above depre-ciable property- 1, 941, 372.67
Cost remaining at December 31, 1944. 5, 599,134.37
*816 Giving effect to the adjustments to the above cost as shown by the examining agent’s report dated June 20,1949.
Add: removal and other related costs less salvage recovered_ $546, 882.71
6,146, 017. 08
Reduction per report dated 9/13/48_ 144,359.91
Total loss adjusted_ 6, 001, 657.17
Allocation to years:
1945 (%)_ $3,000,828.58
1946 (%o)_ 2,400,662.87
1947 C/io)_ 600,165.72
6, 001, 657.17
21. Additional deductions, as adjusted in the foregoing findings, would apply to the following taxable years:

Additional deductions as adjusted above

1945 $656,250.00
1946 525, 000.00
1947 131, 250.00
Total_ 1, 312, 500. 00
22. Plaintiff’s excess profits tax liabilities for the period April 1, 1943 to December 31, 1943, and the calendar year 1944 were calculated by application of an excess profits credit based on plaintiff’s invested capital under the provisions of section 718 and related sections of the Internal Eevenue Code of 1939. Upon audit by the Internal Eeve-nue Service plaintiff was allowed an unused excess profits credit carryback from the calendar year 1945 to the period April 1, 1943 to December 31, 1943, and an unused excess profits credit carryback from the calendar year 1946 to the calendar year 1944. These excess profits credit carrybacks were likewise calculated on the basis of a determination of plaintiff’s invested capital under the provisions of section 718 and related sections of the Internal Eevenue Code of 1939. The portion of plaintiff’s equity invested capital attributable to money and property paid for capital stock has been established by the Internal Eevenue Service to be $5,-662,316.44 for the period ended December 31, 1943, and for *817 tlie calendar years 1944, 1945 and 1946. In tlie determination of this sum, no amount was included for the 25,000 shares of plaintiff’s common stock issued on or about December 18,1905, to the Extension Company.
23. Accumulated earnings and profits at the beginning of the taxable year are includible in invested capital for the purpose of calculating the excess profits credit for that year and the unused excess profits credit carryback. The plaintiff’s tax liability for the 1943 period here involved, on the basis of which plaintiff made payment of additional tax during 1949 as shown above, was determined in a revenue agent’s report dated June 20, 1949. Exhibit L-l, page 69, of that report states that the amount of plaintiff’s tax liability for the 1943 period and year 1944 used in computing the net additions to accumulated earnings for such years does not take into account the reduction of that liability which has occurred through applying the net operating loss and unused excess profits credit carrybacks. These carrybacks arose in the loss years 1945 and 1946 and were carried back to the 1943 period and year 1944 in computing the tax liability for such years.
24. Plaintiff contends that its actual tax liability as finally determined should be used in computing the earnings and profits for the 2 taxable years stated. Defendant denies this contention. If this court should find for plaintiff on this issue, the amount of accumulated earnings and profits includible in computing plaintiff’s invested capital, and hence its excess profits credits, will be calculated by using plaintiff’s ultimate tax liability for the 1943 period and year 1944 to be determined under 38 (c) of the rules of this court in giving effect to the findings in this proceeding.
25. It is plaintiff’s contention that for the purpose of determining its equity invested capital for the period ended December 31, 1943, and for the calendar years 1944, 1945 and 1946, in order to ascertain taxpayer’s excess profits tax liability for the period ended December 31, 1943, and for the calendar year 1944, there should be added to the sum of $5,662,316.44, plaintiff’s equity invested capital as determined by the Internal Revenue Service, an amount as to property paid for stock issued by plaintiff equivalent to the *818 fair market value of the 25,000 shares of plaintiff’s common stock issued on or about December 18, 1905, in part consideration for the properties of the Extension Company.
For the purpose of resolving this issue, plaintiff and defendant have stipulated that (a) if this court should find that said 25,000 shares of plaintiff’s common stock were issued on December 18, 1905, in part consideration for the properties acquired from the Extension Company, and (b) if this court should find that such stock had a fair market value, then and in such event the portion of plaintiff’s equity invested capital referable to capital stock would be the sum of $5,662,316.44 plus said fair market value.
ULTIMATE FINDINGS
26. In finding 14 it was determined that the fair market value of plaintiff’s new common stock authorized December 18, 1905, was reasonably $70 per share. There is no satisfactory evidence that the 25,000 shares of plaintiff’s common stock issued to the Extension Company were truly a part of the consideration for the assets acquired by plaintiff through an indenture and conveyance by the Extension Company to the plaintiff dated December 18, 1905.
The true stockowners of the plaintiff company and the Extension Company at December 18, 1905, when the transactions occurred, are not determinable from the evidence. It is reasonable to conclude that they were identical (see findings 10 and 11). When the Extension Company was organized on February 21, 1905, it issued 500 shares of capital stock, of which 496 shares were issued to W. S. McCrea, plaintiff’s secretary and a director, obviously the “straw man” or nonentity.
27. The cost of improvements, and certain equipment for exploiting the franchise issued to the Extension Company, was financed through Isidore Newman & Sons of New York on notes issued to them by the plaintiff company. The plaintiff, in turn, received and held notes for like amounts as evidence of indebtedness of the Extension Company. By December 18, 1905, the Extension Company’s improvement costs amounted to $700,000, including capitalized expenses for interest and discount of $10,255.92, office expense of $8,829.09 and freight and handling of $120.49.
*819 28. On December 18,1905, when all of tbe pertinent transactions were approved and made effective, including the conveyance of the property by the Extension Company to the plaintiff, the finance company, Isidore Newman & Sons, held 4-95 shares of the capital stock of the Extension Company, representing 99 percent thereof. One share each was held by five other individuals. At the same time Isidore Newman & Sons, as trustees, held 4,989 shares of the old common stock of the plaintiff, or 99.78 percent thereof, and 1 share each was held by 11 other individuals.
On December 18, 1905, the plaintiff company’s stockholders authorized the issuance of 25,000 shares of preferred stock, 25,000 shares of common stock and $10,000,000 of 5 percent bonds and, by mutual agreement between the parties concerned, all of the following transactions were consummated as of that date: (a) Isidore Newman & Sons cancelled and surrendered plaintiff’s notes amounting to $650,000 and accepted in lieu thereof the Extension Company’s notes in like amount; (b) plaintiff issued $700,000 in bonds and 25,000 shares of its common stock to the Extension Company; (c) the Extension Company conveyed all of its assets and liabilities, having a net book value of $700,000, other than the $650,000 in notes, to the plaintiff; (d) the Extension Company transferred and conveyed to Isidore Newman & Sons the $700,000 in bonds issued by the plaintiff in exchange for the $650,000 in notes, thereby cancelling its remaining liabilities; (e) the Extension Company then approved the distribution to its own stockholders of the 25,000 shares of plaintiff’s common stock with the provision “that each stockholder be entitled to receive his equal pro rata share of said securities, but that each stockholder may assign such right to such person, firm or corporation as he may, by an order in writing, designate.” Considering all of the evidence in this case, it is reasonable to conclude that the stockholders of the Extension Company and the plaintiff were identical and that 25,000 shares of plaintiff’s common stock were indirectly paid to plaintiff’s own stockholders.
29. By the foregoing transactions the Extension Company liquidated all of its assets and liabilities. It had never established an evaluation of its franchise on its own books. *820 There is no evidence that the plaintiff had established or determined any value for the franchise acquired from the Extension Company on December 18,1905. There is no evidence that the plaintiff’s earnings were sufficiently increased after the acquisition of the additional franchise and other assets from the Extension Company whereby a reasonable determination of the value of such franchise might be made. The plaintiff’s annual earnings for the calendar years 1904 through 1908, and its bonded indebtedness at December 31, 1905, through 1908, are reflected in the following tabulation:

Net earnings Bonded, indebtedness

1904 _ $184,281 _
1905 _ 187,998 $5,700,000
1906 - 247,925 7,400,000
1907 _ 192,411 8,000,000
1908 _ 171,559 8,083,000
30. The Extension Company had not fully developed its franchise and had never operated any part of it. There is no evidence that the Extension Company had ever intended to operate its franchise or that it could have been operated profitably, except as an adjunct of the plaintiff’s system.
It is reasonable to conclude that the $700,000 of 5 percent bonds issued by the plaintiff as of December 18,1905, represented the fair and reasonable net value of all assets acquired by the plaintiff from the Extension Company and that no consideration can be reasonably attributable to the 25,000 shares of its common stock as a part of the consideration of such assets, as set forth in the proposed agreement of December 18, 1905, by the Extension Company. The final agreement between the plaintiff and the Extension Company has not been furnished in evidence.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and the petition is, therefore, dismissed.

 See finding 17.

 Rey. Rul. 55-28, 1955-1 Cum. Bull. 359.

 The date of December 31, 1912, has been used for the purpose of ascertaining the cost attributable to intangibles included in the total cost basis of plaintiff’s property, since subsequent to that date and up to the abandonment of plaintiff’s street railway lines and operations no change has occurred with respect to such intangible costs.

 The error of $14,712.47 in the amount carried into the total is not explained in the revenue agent’s report.