MOTORS INSURANCE
CORPORATION

v.

The UNITED STATES.

MOTORS INSURANCE CORPORA-
TION, Successor in Interest to General
Exchange Insurance Corporation

v.

The UNITED STATES

Nos. 132–73 and 133–73.

United States Court of Claims.

Jan. 28, 1976.

E. Alan Moorhouse, Washington, D. C., attorney of record, for plaintiff; Frazer F. Hilder and Paul H. Zalecki, Detroit, Mich., of counsel.

Bruce W. Reynolds, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, Washington, D. C., for defendant; Theodore D. Peyser, Jr., and John E. Evans, Washington, D. C., of counsel.

Before DURFEE, Senior Judge, SKELTON and BENNETT, Judges.

## OPINION

BENNETT, Judge.

This income tax refund litigation comes before us upon a stipulation of facts pursuant to Rule 134(b) of the Rules of this court. Because of similarity of issues, the cases are consolidated for decision. We are invited in each case to decide issues involving the foreign tax credit, which the parties represent to be questions of first impression. First, where a corporate taxpayer seeks a net operating loss carryback adjustment for a prior taxable year in which it claimed and was allowed a foreign tax credit, we are asked whether the prior year's foreign tax credit limitation imposed by section 904, Internal Revenue Code of 1954, must be recomputed so as to reflect the impact of the net operating loss deduction.[1] A second question must be

---

1. At the time in question sections 841 and 901 of the Internal Revenue Code of 1954 allowed taxpayers to credit against United States tax liability certain amounts of taxes paid or accrued to foreign countries. Section 841 merely incorporates section 901 by reference, permitting application of section 901 *et seq.* in the case of certain domestic insurance companies. Section 901 then provided, in pertinent part:

"§ 901. *Taxes of foreign countries and of possessions of United States.*

"(a) *Allowance of credit.*—If the taxpayer chooses to have the benefits of this subpart, the tax imposed by this chapter shall, subject

faced only if the first is answered in the affirmative: if a net operating loss carryback deduction does require recomputation of the prior year's limitation on allowable foreign tax credit, in assigning the correct value to the new limitation fraction, we must inquire whether such net operating loss carryback deduction should be allocated directly to income from specific geographical sources, or on the other hand, should be apportioned ratably between gross income from foreign sources and gross income from sources within the United States.[2]

Motors Insurance Corporation (MIC) is a stock casualty insurance corporation duly organized and existing under the laws of the State of New York, with its principal place of business in New York City. At all relevant times MIC had operations solely in the United States and Canada. Case No. 132–73 involves a claim for refund of income taxes assessed and paid for MIC's taxable year 1959. For that year the taxpayer first reported taxable income from all sources of $3,571,592.67, and taxable income from Canadian sources of $882,633.99. Before application of the foreign tax credit, MIC's United States income tax amounted to some $1,851,728.19.

Section 904 of the Code imposes an upper limit upon the amount of available credit, which conveniently may be expressed in terms of the following formula:[3]

$$\text{Maximum allowable foreign tax credit} = \text{United States income tax liability before application of foreign tax credit} \times \frac{\text{Taxable income from the relevant foreign country}}{\text{Taxable income from all sources}}$$

Substituting the figures applicable to this case, in its original return for taxable year 1959 the taxpayer computed its section 904(a) limitation on foreign tax credit to be $457,610.50, as follows:

$$\text{Maximum allowable foreign tax credit ($457,610.50)} = \$1,851,728.19 \times \frac{\$ 882,633.99}{\$3,571,592.67}$$

to the limitation of section 904, be credited with the amounts provided in the applicable paragraph of subsection (b) * * *.

"(b) *Amount allowed.*—Subject to the limitation of section 904, the following amounts shall be allowed as the credit under subsection (a):

"(1) *Citizens and domestic corporations.*—In the case * * * of a domestic corporation, the amount of any income * * * taxes paid or accrued during the taxable year to any foreign country * * *."

Section 904, however, imposed an upper limit upon the available credit:

"§ 904. *Limitation on credit.*

"(a) *Limitation.*—The amount of the credit in respect of the tax paid or accrued to any country shall not exceed the same proportion of the tax against which such credit is taken which the taxpayer's taxable income from sources within such country (but not in excess of the taxpayer's entire taxable income) bears to his entire taxable income for the same taxable year."

2. Treas.Reg. § 1.901–2(d) (1959) provided, while in force:

"§ 1.901–2 *Definitions.*

\* \* \* \* \* \*

"(d) The principles of sections 861 through 864 and the regulations thereunder shall apply in determining the sources of income for the purposes of sections 901–905, inclusive."

Int.Rev.Code of 1954, § 862(b), provides:

"(b) *Taxable income from sources without United States.*—From the items of gross income specified in subsection (a) there shall be deducted the * * * losses * * * properly apportioned or allocated thereto, and a ratable part of any * * * losses * * * which cannot definitely be allocated to some item or class of gross income. * * *."

3. This formula appears upon inspection of section 904, note 1, *supra.* We have some experience in its application. *Missouri Pac. R.R. v. United States,* 392 F.2d 592, 183 Ct.Cl. 168 (1968).

Inasmuch as MIC encountered creditable tax liability to Canada in that year only to the extent of $307,876.56, a credit was noted on the return for the entire amount of such Canadian tax properly accrued.

For its taxable year 1962 MIC experienced a net operating loss, and by reason thereof on August 26, 1963, filed an Application for Tentative Carryback Adjustment (form 1139) for its taxable year 1959. In short, MIC took advantage of the privilege conferred by section 172 of the Code to reopen its taxable year 1959 and to report as an additional deduction from that year's gross income a portion of its 1962 net operating loss.[4] By check dated November 15, 1963, MIC received a refund of the entire $1,543,851.63 claimed in the application, together with statutory interest amounting to $80,-745.55.

Thereafter the Internal Revenue Service conducted a timely audit of MIC's taxable year 1959. The service determined that the taxpayer owed the Treasury an additional $279,466.58 in respect of that year as well as statutory interest of $50,642.42, principally on account of two adjustments. First, the amount of the net operating loss carryback deduction was reduced from $3,142,883.07 to $2,555,816.69. In this much of defendant's action plaintiff finds no error. Second, the service recomputed MIC's 1959 limitation on foreign tax credit. A specific portion of the 1959 net operating loss deduction attributable to 1962 losses was directly allocated to 1959 taxable income from Canadian sources. Thus, taxable income from Canada—the numerator of the section 904 limitation fraction—was reduced by $408,842.11 from the original $882,633.99, to a new figure of $473,791.88. The denominator of the fraction—taxable income from all sources—diminished to the extent of the entire net operating loss carryback deduction. This figure became $1,016,-875.54. On account of the carryback deduction MIC's United States recomputed income tax prior to application of the foreign tax credit totalled $523,275.28. Thus, the service calculated the new credit limitation to be $243,808.70, as follows:

$$\text{Recomputed foreign tax credit limitation} = \$523,275.28 \times \frac{\$473,791.88}{\$1,016,875.54}$$
$$(\$243,808.70)$$

The $243,808.70 limitation so ascertained resulted in partial disallowance of the $307,876.56 foreign tax credit originally reported for taxable year 1959.

The taxpayer instituted this timely action upon payment of the disputed assessment and administrative denial of its refund claim. Plaintiff invokes our jurisdiction under 28 U.S.C. § 1491 (1970).

In the companion case, No. 133–73, MIC sues as successor in interest to General Exchange Insurance Corporation (GEIC), which predecessor merged into MIC on May 31, 1960. Like MIC, GEIC confined its business enterprise to the United States and Canada. At all relevant times GEIC also was a stock casualty insurance corporation duly organized under the laws of New York. This controversy involves a claim for refund of income taxes assessed and paid for GEIC's taxable year 1955. For that year this taxpayer reported in an amended return taxable income from all sources

---

**4.** Section 172, Int.Rev.Code of 1954, provides, in part:

"§ 172. Net Operating Loss Deduction.

"(a) *Deduction allowed.*—There shall be allowed as a deduction for the taxable year an amount equal to the aggregate of (1) the net operating loss carryovers to such year, plus (2) the net operating loss carrybacks to such year. * * * .

"(b) *Net operating loss carrybacks and carryovers.*—

* * * * * *

"(2) *Amount of carrybacks and carryovers.*— * * * [T]he entire amount of the net operating loss for any taxable year (hereinafter in this section referred to as the 'loss year') shall be carried to the earliest of the [7] taxable years to which * * * such loss may be carried. The portion of such loss which shall be carried to each of the other [6] taxable years shall be the excess, if any, of the amount of such loss over the sum of the taxable income for each of the prior taxable years to which such loss may be carried. * * *."

of $13,402,922.05, and taxable income from Canadian sources of $1,094,586.89. Before application of the foreign tax credit, GEIC's United States income tax, as originally reported, amounts to $6,961,704.82.

In its tax return for taxable year 1955 the taxpayer computed its section 904(a) limitation on foreign tax credit to be $568,546.98, as follows:

$$\text{Maximum allowable foreign tax credit } (\$568,546.98) = \$6,961,704.82 \text{ (United States income tax before foreign tax credit)} \times \frac{\$1,094,586.89 \text{ (taxable income from Canadian sources)}}{\$13,402,922.05 \text{ (taxable income from all sources)}}$$

Inasmuch as GEIC encountered creditable tax liability to Canada in that year only to the extent of $353,535.11, a credit was noted on the return for the entire amount of such Canadian taxes properly accrued.

For its taxable year 1957 GEIC experienced a section 172 net operating loss,[5] and by reason thereof on June 16, 1958, filed an Application for Tentative Carryback Adjustment (form 1139) for its taxable 1955. By check dated October 7, 1958, GEIC received a tax refund of $796,221.08, together with statutory interest of $36,746.14.

The Internal Revenue Service responded by conducting a timely audit of GEIC's taxable year 1955. The service determined that MIC, as GEIC's successor, owed the Treasury an additional $155,617.45 in respect of that year as well as statutory interest of $94,293.61, principally on account of two adjustments. First, the amount of the net operating loss carryback deduction was reduced from $1,531,194.38 previously asserted to $1,520,253.57. The parties do not dispute this action. Second, the service recomputed GEIC's 1955 limitation on foreign tax credit. A specific portion of the 1955 net operating loss deduction attributable to 1957 losses was directly allocated to 1955 taxable income

from Canadian sources. Thus, taxable income from Canada—once again, the credit limitation numerator—was reduced by $1,417,033.66 from an adjusted figure of $1,065,801.52, or, to zero.[6] As a necessary consequence the totality of GEIC's initially reported foreign tax credit for 1955 was disallowed and a deduction of $353,811.22 substituted therefor.

MIC instituted this timely action upon payment of the disputed assessment and administrative denial of its claim for refund. Once again, plaintiff invokes our jurisdiction under 28 U.S.C. § 1491 (1970).

In both cases, Nos. 132–73 and 133–73, MIC stipulates that it does not dispute the amount of the allocation of net operating loss made to Canadian branch operations of MIC and GEIC in their respective loss years. However, plaintiff stops short of conceding the legal correctness of the allocation so made for purposes of computing the prior years' section 904 limitations—upon MIC's foreign tax credit for 1959, and GEIC's credit for 1955.

I.

In resolving the first issue—whether a net operating loss carryback deduction requires recomputation of a prior, profit-

---

5. See note 4, supra.

6. It will be recalled that GEIC originally reported as taxable income from Canadian sources $1,094,586.89, which amount figured in the initial computation of the section 904 limitation. The stipulation bears out the infer-

ence that during the course of auditing GEIC's taxable year 1955, the service lowered this figure for other reasons to $1,065,801.52 before allocating thereto any portion of the 1955 net operating loss deduction attributable to 1957 losses.

able year's foreign tax credit limitation—we start by observing the judicially recognized policies which undergird these important taxing provisions. These purposes will guide us in the solution of these difficult cases, and must be kept in mind throughout.

■ The Supreme Court at an early date articulated the legislative purpose in adopting the net operating loss carryover and carryback provisions:

> * * * Those provisions were enacted to ameliorate the unduly drastic consequences of taxing income strictly on an annual basis. They were designed to permit a taxpayer to set off its lean years against its lush years, and to strike something like an average taxable income computed over a period longer than one year [footnote omitted]. * * *. [*Libson Shops, Inc. v. Koehler*, 353 U.S. 382, 386, 77 S.Ct. 990, 993, 1 L.Ed.2d 924 (1957).]

Thus, in limited circumstances a taxpayer will be allowed under section 172 of the 1954 Code to recognize as a deduction against gross income in a profitable year a portion of losses actually realized in another, to the end of "averaging out" taxable income over a span of years more closely resembling a true business cycle.

■ The purpose of the foreign tax credit rules, section 901 *et seq.*, we perceive to be similarly ameliorative. These provisions are calculated to relieve the taxpayer, within stated limits of harsh consequences attendant upon double taxation of the same elements of its taxable income. *American Chicle Co. v. United States*, 316 U.S. 450, 451, 62 S.Ct. 1144, 86 L.Ed. 1591 (1942). But Congress has seen fit in section 904 to impose a limitation upon the foreign tax credit. The legislature has stated, in effect, that the amount credited against United States income tax liability shall not exceed the United States income tax which otherwise would be due on account of foreign-source taxable income, in the absence of

the credit. Alternatively stated, as we said in *Missouri Pac. R.R. v. United States*, 392 F.2d 592, 601, 183 Ct.Cl. 168, 181 (1968), the foreign tax credit limitation "is designed to prevent the tax credit from reducing or eliminating the United States tax on income from sources within the United States."

■■ Bearing in mind these purposes we turn to the first of the problems at hand. Must a section 904 limitation on foreign tax credit be recomputed where, due to net operating loss in a subsequent year, the prior year's return is reopened and the taxable income reported thereon adjusted by application of the additional deduction embodied in section 172(a)(2)? Of logical necessity it must, and we so hold:

■ The correctness of this view emerges upon examination of the applicable taxing statutes. At all operative times section 841(2) of the Code provided, in pertinent part:

§ 841. Credit for Foreign Taxes.

The taxes imposed by foreign countries * * * shall be allowed as a credit against the tax of a domestic insurance company subject to the tax imposed by section * * * 831, to the extent provided in the case of a domestic corporation in section 901 (relating to foreign tax credit). *For purposes of the preceding sentence, the term "taxable income" as used in section 904 means—*

> * * * * * *

(2) in the case of the tax imposed by section 831, *the taxable income (as defined in section 832(a)).*[7] [Emphasis supplied.]

Section 832 in part provided:

(a) *Definition of taxable income.* —In the case of an insurance company subject to the tax imposed by section 831, *the term "taxable income" means the gross income as defined in subsec-*

---

**7.** Section 831(a)(1) of the Code imposed taxes as computed in section 11 upon the taxable income of every insurance company other than life insurance companies or mutual insurance

companies. The stipulation recites that plaintiff and its predecessor were at the relevant times "stock casualty insurance companies." Therefore, section 831 applies in these cases.

tion (b)(1) less the deductions allowed by subsection (c).

\* \* \* \* \* \*

(c) Deductions allowed.—In computing the taxable income of an insurance company subject to the tax imposed by section 831, there shall be allowed as deductions:

\* \* \* \* \* \*

(10) deductions \* \* \* as provided in part VI of subchapter B (sec. 161 and following, relating to itemized deductions for individuals and corporations); \* \* \*. [Emphasis supplied.] Section 172, which allows a deduction for certain net operating loss carrybacks, has always been situated in part VI of subchapter B, Internal Revenue Code of 1954. To us the conclusion seems legally irresistible that in computing taxable income for purposes of the numerator and the denominator of the section 904 limitation fraction, a section 172 net operating loss deduction attributable to a business reverse in a later year must, under section 832(c)(10), be treated like any other deduction from the prior year's gross income. Where taxable income under section 172 is reduced in general to the extent of the additional deduction, we think the Code provisions above show beyond doubt that such taxable income must be reduced in particular for purposes of the foreign tax credit limitation set down in section 904. We should not be inclined to depart from this reasoning in the absence of manifestly controlling authority requiring a contrary result.

Plaintiff resists this characterization of its case first by citing Lewyt Corp. v. Commissioner, 349 U.S. 237, 75 S.Ct. 736, 99 L.Ed. 1029 (1955). The taxpayer deduces from this case the asserted principle that the net operating loss carryback deduction is unique among taxing provisions and, as such, applies to the earlier, profitable carryback year only for the limited purpose of allowing an additional deduction from that year's gross income. In short, plaintiff contends that the loss carryback has no bearing whatever on the prior year's foreign tax credit limitation.

In Lewyt the taxpayer experienced profitable years in 1944 and 1945, but realized net operating losses both in 1946 and 1947. It sought to deduct the net operating loss attributable to 1946 against its previously reported income both for 1944 and 1945. The Commissioner disapproved a deduction for 1945 on the ground that 1944 income was more than sufficient to absorb the entirety of allowable 1946 loss, and that under section 122(b)(1) of the 1939 Code, a deduction could be permitted against income in the year (1945) next preceding the loss year (1946) only if income realized in the second preceding taxable year (1944) was entirely abated by the later year's (1946) net operating loss.[8] In his determination that 1944 net income was large enough to accommodate the entire 1946 loss, the Commissioner developed the position that the 1946 net operating loss required (1) recomputation and downward adjustment of an excess profits tax due and owing for 1944—which would result in diminution of the income tax deduction originally taken on account of such excess profits tax liability, and (2) a corresponding upward adjustment of 1944 net income. Such enhanced 1944 net income was large enough to absorb the totality of the 1946 loss. Thus the Court was called upon to decide "whether the excess profits tax that may be offset [as a deduction under section 122(d)(6)] against 1944 net income is the amount of excess profits tax reported for the year in question [under

---

**8.** Section 122(b)(1) of the 1939 Code, as amended, provided:

"If for any taxable year \* \* \* the taxpayer has a net operating loss, such net operating loss shall be a net operating loss carryback for each of the two preceding taxable years, except that the carry-back in the case of the first preceding taxable year shall be the excess, if any, of the amount of such net operating loss over the net income for the second preceding taxable year computed (A) with the exceptions, additions, and limitations provided in subsection (d)(1), (2), (4) and (6), and (B) by determining the net operating loss deduction for such second preceding taxable year without regard to such net operating loss." [26 U.S.C. § 122(b)(1) (1946).]

the taxpayer's accrual accounting method] or the amount ultimately found to be due" as recomputed in light of the net operating loss carryback. 349 U.S. at 238, 75 S.Ct. at 738.

In holding for the taxpayer, the Court did conclude that the net operating loss deduction did not require recomputation of a prior year's income tax deduction for an excess profits tax liability, where such deduction had been properly accrued in the prior year. *Id.*, 349 U.S. at 242–43, 75 S.Ct. at 740.

> In short, the amount of tax accrued within the taxable year under § 122(d)(6) is to be determined in accord with the normal accounting concepts relevant to the accrual basis. That amount is not, of course, to be ascertained solely by reference to the figure set forth in the taxpayer's return, for that figure may be erroneously computed on the accrual basis. But when an amount is arrived at by proper application of recognized accounting principles on the accrual basis, the test of § 122(d)(6) has been met. Events and transactions of later years, irrelevant to a determination of income on the accrual basis, do not warrant alteration of the figure computed under § 122(d)(6) for the year in question.

We think that Mr. Justice Douglas turned the decision in *Lewyt* principally on a proper reading of section 122(d)(6) of the 1939 Code, which provided for a deduction against gross income for "'the amount of tax *imposed by* Subchapter E of Chapter 2 [*i. e.*, the excess profits tax] paid or *accrued* within the taxable year * * * .'" 349 U.S. at 238–39, 75 S.Ct. at 738. (Italics by Court.) But we do not think that *Lewyt* may properly be understood to hold that a net operating loss *never* affects the taxable income of a prior year, in the face of specific taxing statutes in the 1954 Code which lead so forcefully to a contrary result in the case of a foreign tax credit limitation. In view of the technical wording of the 1939 Code so heavily relied upon in the

Supreme Court's opinion, and because of the 5–3 split in the *Lewyt* Court,[9] we decline the invitation to extend its rationale to the cases before us. Although the accrual method of accounting may in some instances render irrelevant events in later years, nothing in *Lewyt* purports to hold that Congress may not otherwise provide, as in the case of sections 841, 832, 172, and 904, previously discussed.

This court's opinion in *National Forge & Ordnance Co. v. United States*, 151 F.Supp. 937, 139 Ct.Cl. 204 (1957), confirms *Lewyt's* inapplicability here:

> The *Lewyt* case says it must be computed on the income accrued within the taxable year. * * * [T]he court said with equal clarity that events transpiring after the close of the taxable year were not to be taken into account. However, we must conclude that this means, "*except those required by statute or valid regulation to be taken into account.*" * * *.
>
> We hold, therefore, that in computing the excess-profits tax to be deducted from 1944 income, in order to determine the amount of the net loss for 1946 to be applied against it, we must compute it on its income accrued within the year, as extended by section 3806 and I.T. 3611.
>
> After the deduction of these excess profits taxes, the net operating loss is to be applied against the remainder. If it exceeds the remainder, the excess is to be applied against 1945 net income.
>
> We think this is in accord with the holding of * * * *Lewyt Corp.*, * * * *supra.* [Emphasis supplied. 151 F.Supp. at 939, 139 Ct.Cl. at 208.]

Other cases giving *Lewyt* a narrow reading include *Budd Co. v. United States*, 252 F.2d 456, 458 (3d Cir. 1957), and *Commissioner v. Pacific Affiliate, Inc.*, 224 F.2d 578, 580 (9th Cir. 1955).

Plaintiff next seeks comfort in *Memphis Transit Co. v. United States*, 297 F.2d 542, 155 Ct.Cl. 797 (1961), *cert. denied*, 371 U.S. 815, 83 S.Ct. 26, 9 L.Ed.2d

---

**9.** Mr. Justice Frankfurter's *Lewyt* dissent was cited with approval by the majority in the later case, *Libson Shops, Inc. v. Koehler, supra*, 353 U.S. at 386 n. 5, 77 S.Ct. 990, 1 L.Ed.2d 924.

872

56 (1962), wherein taxpayer sued for refund of income and excess profits taxes. After generating profits in 1943 and 1944, the plaintiff encountered losses in 1945, 1946, and 1947 due to abandonment of its investment in an electric street railway system. For these loss years, the taxpayer sought carryback adjustment relating to 1943 and 1944.

In its bid for refund of excess profits tax the taxpayer theorized in part as follows: (1) The net operating loss carryback deductions decreased the amount of income and excess profits taxes due for its prior, profitable years. (2) Such decreased tax liability resulted in a corresponding increase in the taxpayer's accumulated earnings and profits accounts for taxable years 1944 and 1945. (3) Such increase in turn enlarged available excess profits credits for those years, and so decreased the adjusted excess profits net income subject to tax. 297 F.2d at 545–46, 155 Ct.Cl. at 802–03. The opinion indicates that the court relied primarily on the logic of Rev.Rul. 55–28, 1955–1 Cum.Bull. 359, in rejecting this line of reasoning. The court did say, however, that it thought the argument to be at odds with the *Lewyt* decision.

Our decision today is entirely consistent with *Memphis Transit, supra,* although that case had nothing to do with the foreign tax credit. There, much like the Supreme Court in *Lewyt,* this court principally concerned itself with proper application of accrual accounting techniques in the absence of specific statutory provision mandating an exception to the general rule—as in the case of sections 841, 832, 172, and 904 when read as an integrated whole. We do not think this decision lends any particular support to taxpayer here, in view of our earlier decision in *National Forge & Ordnance Co., supra.* We prefer a dutiful application of the statutes themselves.

Plaintiff looks also to *Manning v. Seeley Tube & Box Co.,* 338 U.S. 561, 70 S.Ct. 386, 94 L.Ed. 346 (1950). There in a profitable year the taxpayer encountered income tax liability which was tardily paid, together with assessed statutory interest. Subsequently, the company was adjudged bankrupt and, owing to a net operating loss in the year of its demise, carried back an appropriate deduction to the prior year. The deduction was sufficient to abate the entire tax liability for such prior year, but upon application for refund the service declined to return the statutory interest which had been assessed and paid due to the taxpayer's lateness in filing. The Supreme Court approved the Government's action. It was thought that although the carryback did ultimately abate the erstwhile tax liability, at all times prior to the loss year the Treasury had had the right to possess the money while the taxpayer had retained its use. 338 U.S. at 565–66, 70 S.Ct. 386. The Court declined to construe the net operating loss carryback provisions in a manner which would approve a taxpayer's failure to pay its tax on time. *Id.* 338 U.S. at 567, 70 S.Ct. 386. We see no conflict between this decision and our conclusion in these cases. *Manning* relates to the duty to pay tax punctually, and to the Government's correlative right to possess the funds so paid. These matters have little if any bearing on the question we now face: the effect of a net operating loss carryback deduction upon a carryback year's foreign tax credit limitation. If anything, *Manning* supports our view:

> * * * it is true that for many purposes the carry-back is equivalent to a *de novo* determination of the tax, * * *. [338 U.S. at 567, 70 S.Ct. at 390.]

We are not impressed by plaintiff's reliance on the *Manning* decision.

 As stated, we think our decision to be required by application of the statutory provisions hereinbefore mentioned. Moreover, persuasive authority supports this approach. Rev.Rul. 71–432, 1971–2 Cum.Bull. 270 is directly in point, except that it states the case of a domestic corporation deriving its entire income from sources in two foreign countries. The service there holds that a net operating loss carryback does require recomputation of a previously reported limita-

tion on foreign tax credit. The Commissioner adheres to a like position in the case of a net operating loss carryover from a loss year to a later year. Rev. Rul. 69–121, 1969–1 Cum.Bull. 194. Additionally, defendant refers us to Treas. Reg. § 1.172–5(a)(3)(ii) (1975) which states:

> Unless otherwise specifically provided in this subchapter, any deduction which is limited in amount to a percentage of the taxpayers' taxable income * * * shall be recomputed upon the basis of the taxable income * * * determined with the modifications prescribed in this paragraph * * *.

This regulation goes on to explicate adjustments required by a net operating loss carryback, in respect of the prior year's deductions which are subject to limitations expressed as a percentage of taxable or adjusted gross income. Had the service included in this language a reference to *credits* limited by reference to a percentage of taxable income, we might assume that these cases would not presently be before us. Nonetheless, in the absence of a showing that section 1.172–5(a)(3)(ii) clearly *contradicts* the statute it purports to interpret, we are required to consider it a correct construction of the law—at least so far as it goes. *Commissioner of Internal Revenue v. South Texas Lumber Co.*, 333 U.S. 496, 501, 68 S.Ct. 695, 92 L.Ed. 831 (1948). Here we think it to be presumptively correct and highly persuasive authority for the defendant's position, with which we thoroughly agree.

As a final persuasive authority one should consult E. Owens, Foreign Tax Credit 254–57 (1961), wherein the author discusses the issue which now confronts this court. Her treatment of the topic indicates that a net operating loss carryback deduction does indeed mandate recomputation of both numerator and de-

nominator in the prior year's foreign tax credit limitation fraction.[10]

▮ Our conclusion that a net operating loss carryback deduction impels revision of the carryback year's foreign tax credit limitation coexists comfortably with the aforementioned policies underlying these taxing provisions. A reduced limitation on foreign tax credit more accurately reflects average taxable income over the business cycle. *Libson Shops, Inc. v. Koehler, supra.* In like manner, a reduced limitation assures the Treasury that the credit will not deprive it of taxes due on account of taxable income, as recomputed, from sources within the United States. *Missouri Pac. R. R. v. United States, supra.* Leaving the credit untouched by a carryback deduction in effect would provide a dollar-for-dollar abatement of a portion of income taxes attributable to United States taxable income, as recomputed. We could not sanction such a result.

## II.

Having decided that a previously reported foreign tax credit limitation must be adjusted to take account of a net operating loss carryback deduction, in recomputing such limitation it remains to inquire whether the deduction is susceptible of direct allocation to income from specific, geographical sources in the prior carryback year. The taxpayer would have us reply in the negative, apportioning its loss ratably between Canadian and United States income.

Section 862(b), Internal Revenue Code of 1954, provides:

> (b) *Taxable income from sources without United States.*—
>
> From the items of gross income specified in subsection (a) there shall be deducted the expenses, losses, and other deductions properly apportioned or allocated thereto, and a ratable part of any expenses, losses, or other deduc-

---

10. *See generally* Gifford, *United States Tax Effects of Foreign Losses: A Symmetry Analysis,* 83 Yale L.J. 312, 339–40 (1973). The author examines what he believes to be inconsistent treatment of foreign losses by the Code, and makes suggestions for change: "If a current loss has an effect on the foreign tax credit computations for years other than the loss year * * * then the effect will not be symmetrical since gain will affect the computation only for the current year."

tions which cannot definitely be allocated to some item or class of gross income. The remainder, if any, shall be treated in full as taxable income from sources without the United States.

Treas.Reg. § 1.901–2(d) (1959) establishes the applicability of section 862(b) of the Code in these cases for purposes of ascertaining the numerator of the credit limitation fraction:

> (d) The principles of sections 861 through 864 and the regulations thereunder shall apply in determining the sources of income for the purposes of sections 901–905, inclusive.

The taxpayer contends that a net operating loss carryback deduction, relating as it does to operations in a subsequent loss year, cannot properly be allocated directly to specific geographical income sources for *any* prior year. Rather, these deductions must be apportioned ratably between Canadian and American sources by reference to gross income from those countries as set forth in Treas.Reg. §§ 1.862–1(b), 1.861–8(a) (1959). Although the parties have been less than graphic in apprising us of the precise computational consequence of this argument, we think it safe to assume that if we approve the taxpayer's position the numerator of the limitation fraction will be larger than it would be were we to accept the view urged upon us by the Government.

Defendant, for its part, raises as a threshold question the problem of whether section 862(b) of the Code could have applied at all in the case of a stock casualty insurance company during the years in question. Assuming that it did apply, the Government argues that on this stipulation the Code requires direct allocation of net operating loss carryback deductions to Canadian-source income for purposes of recomputing the credit. We may assume that if the Government is correct on either point, the numerator of the *foreign* tax credit limitation fraction will decrease.

As we understand it, the Government's threshold position derives from the wording of section 842 (since deleted) during the operative time:

> The *gross income* of insurance companies subject to the tax imposed by section * * * 831 shall not be determined in the manner provided in part I of subchapter N (relating to determination of sources of income) [section 861 and following]. [Emphasis supplied.]

It is said that if section 861 and following had no bearing upon computation of an insurance company's *gross* income, then likewise those provisions may not apply in determining the taxable income of such a business entity. In this phase of the case the Government seems not to take into account the contrary indication in Treas.Reg. § 1.901–2(d), *supra*, and such authority as exists seems to favor the plaintiff, if only to this extent. In *Northwestern Mut. Fire Ass'n v. Commissioner*, 181 F.2d 133 (9th Cir. 1950), the court appears to have disapproved an argument similar to that now pressed by defendant:

> Taxes imposed upon petitioner * * [a mutual insurance company] were based not upon its normal-tax net income ["taxable income" under the 1954 Code], but solely upon the alternative basis—"gross amount of income" as defined in Int.Rev.Code [of 1939], § 207(a)(2). In view of that fact limitation of foreign-tax credits by a ratio of normal-tax net income appears to have no logical basis. But as legislative history reveals, mutual insurance companies such as petitioner present unusual problems of tax administration. Resolution of those problems has been made, if empirically, by the Congress. Our function is at an end when we have determined the scope of congressional action. [Citation omitted.]
>
> The foreign taxes paid by petitioner * * * do not exceed the limitation specified in * * * § 131(b) [§ 904 of the 1954 Code]. The claims for refund are therefore allowable. [181 F.2d at 136.][11]

For purposes of these cases, however, we think it entirely unneces-

---

11. For a discussion of this case, see E. Owens, Foreign Tax Credit 210–12 (1961).

sary to decide whether the Government is correct in its assertion that the Code's source of income rules have no application in the case of a stock casualty insurance company. Even if we assume that section 862(b) does apply in these cases, as the taxpayer contends, the Government must prevail. Upon the stipulation before us we think that these net operating loss deductions can and must be allocated directly to income generated in the prior carryback years from the same geographical sources. The case law dealing with proper allocation of *current* losses to current sources of income commends this conclusion to us.

In *Torrington Co. v. United States,* 149 F.Supp. 172, 137 Ct.Cl. 622 (1957), plaintiff in 1942 realized a war loss incident to seizure by the Nazi government of its German subsidiary's operating assets. For the same taxable year the parent company claimed a foreign tax credit, but calculated its limitation on such credit in a manner unacceptable to the Treasury. In setting up the limitation fraction, the taxpayer reduced the denominator—normal tax net earnings (now taxable income) from all sources— by the amount of the war loss. It did not reduce the numerator, however— normal tax net earnings from sources without the United States. The taxpayer there took the position that a "war loss" was not a "loss" at all within the meaning of section 119(d) of the 1939 Code, presently codified in section 862(b). In framing the question for decision, the court provides some guidance on the slightly different question at issue here:

> It is apparent from a reading of this subsection that if we hold a § 127 war loss is a loss within the meaning of § 119(d) it must be deducted from gross income from sources without the United States in order to arrive at the correct net income from such sources [which would be the numerator in the limitation fraction]. * * *. [149 F.Supp. at 174, 137 Ct.Cl. at 625.]

Thus, the court assumed the allocation of a loss to a specific, geographical source of income (the situs of the loss assets) to be required by the predecessor of section 862(b) of the Internal Revenue Code of 1954.

Other courts have approached more closely the issue now at hand. Thus, in *De Nederlandsche Bank,* 35 B.T.A. 53 (1936), the then Board of Tax Appeals undertook to consider proper allocation of a current operating loss to the appropriate income source. The taxpayer, a foreign corporation having United States business operations, deducted from its gross income realized within the United States a ratable portion of certain losses on loans made in Europe. Naturally, the service took a contrary position—that the losses were wholly attributable to income from without the United States under section 217(e) of the Revenue Act of 1926, and as such nondeductible against United States-source income. It is true that this case did not involve a foreign tax credit. Yet it is entirely apposite since allocation of operating losses to sources of income there was required for purposes of computing what the 1954 Code defines as taxable income. As we have seen, taxable income constitutes the point of departure in computing a foreign tax credit limitation.

In holding against the taxpayer the court said:

> * * * The losses are * * * clearly identified with specific accounts of banks located in Holland. Moreover, the proceeds of these loans were further advanced by the bank to other concerns doing business in Holland.

> * * * [T]he simple fact seems to be that, whatever the motive that impelled the loans, they were losses suffered on specific accounts in Holland and should be allocated to income earned in Holland.

The corollary of this line of thought is to consider the "Reorganization Loans" from their relation to the earning of income within the United States. The applicable statute (§ 234(b)) allows deductions "only if and to the extent that they are connected with income" within the United States. The remainder of the statute allowing a ratable part of items which

**876**

can not definitely be allocated does not purport to be based on any other premise. The concept underlying this provision is that some part of such items is related to the earning of income within the United States. This relationship to the income within the United States must be apparent, although the determination of the amount may be left to more or less arbitrary allocation. * * * .[12] [35 B.T.A. at 59–60.]

In this case the Board of Tax Appeals approved direct allocation of current operating losses to income from a specific geographical source, because the losses related to the earning of income from such foreign sources.

Similarly, in *Royal Ins. Co.*, 38 B.T.A. 955 (1938), the board approved a resident foreign corporation's allocation of a current loss to income from United States sources, where the asset involved (common stock) had a United States situs:

Obviously, this investment did not produce income outside the United States. *A fortiori,* the loss sustained was not connected with income from outside the United States. * * * .

The investment, from which the loss occurred, was made for the purpose of deriving income from United States sources. * * * . [38 B.T.A. at 957.]

Once again the situs of the asset generating the loss controlled, requiring direct allocation of such losses to income from that same situs. *Stockholms Enskilda Bank,* 40 B.T.A. 107 (1939), followed the geographical situs rule of *Royal Ins. Co.,* on facts exhibiting an even more tenuous connection between the capital asset and its physical location—the United States.

Commissioner of Internal Revenue v. Ferro-Enamel Corp., 134 F.2d 564 (6th Cir. 1943), presents a case requiring allocation of a current loss to income from foreign or domestic sources under section 119(d) of the Internal Revenue Code of 1939 (now section 862(b)), for purposes of computing the limitation on foreign tax credit. A domestic taxpayer purchased stock in one of its suppliers, a Canadian corporation, to the end of assuring itself a constant source of raw material. Ultimately the stock became worthless, and for the year in which the loss was recognized for tax purposes the question arose as to whether it should be allocated to income from United States or Canadian sources under the predecessor of section 862(b). Understandably, the taxpayer allocated it to net income from United States sources—a component of the limitation fraction denominator, while the Commissioner attributed it entirely to income from sources without the United States—diminishing the numerator. 134 F.2d at 565. In reversing the Board of Tax Appeals the court had this to say regarding sections 119(b) and (d):

The statute in question undertakes to classify the sources of income within * * * and without the United States by the nature and location of the activities of the taxpayer or his property which produces the income. If the income be from service, the place where the service is performed is decisive. If the income is from capital, the place where the capital is employed is controlling. If the income arises from the sale of a capital asset or a loss from its disposition, the place where the sale occurs, or the loss happens, is decisive.

---

12. The operative statutes involved in *De Nederlandsche Bank,* 35 B.T.A. 53 (1936), sections 234(b) and 217(e) of the Revenue Act of 1926, provided in part:

"(b) In the case of a foreign corporation * * * the deductions allowed in subdivision (a) shall be allowed only if and to the extent that they are connected with income from sources within the United States; and the proper apportionment and allocation of the deductions * * * shall be determined as provided in section 217 * * * ."

Section 217(e):

"(e) * * * . In the case of gross income derived from sources partly within and partly without the United States, the net income may first be computed by deducting the expenses, losses or other deductions apportioned or allocated thereto and a ratable part of any expenses, losses or other deductions which can not definitely be allocated to some items or class of gross income; * * * ."

Practically the same language now appears in section 862(b).

In the case at bar, the loss by reason of the purchase of the * * * stock occurred when the corporation ceased existence and discontinued its mining operations. The evidence clearly shows that respondent invested in the stock * * * for the sole purpose of obtaining raw material * * *, and that it in no sense intended to make an investment with the expectation of receiving dividends on the stock. As we view the statute, this fact does not convert the loss into a deduction from respondent's income from sources within the United States. The loss grows out of an activity or use of property and the situs of the loss is not transferred to the home of respondent because respondent wished to obtain a source of raw material.

The case should be viewed and decided in the same light as if respondent had purchased a cobalt mine in Canada and had sustained a loss in its operation. Under these circumstances, it would clearly be a loss sustained from sources without the United States. [134 F.2d at 566.]

In summary, *Ferro-Enamel* and the other authorities disclose the rule that where a loss is realized in the endeavor to generate income from specific geographical sources, in applying section 862(b) of the Code such losses may properly be applied in reduction of income from such geographical sources. E. Owens, Foreign Tax Credit 247 (1961).

Turning to the case at bar, the stipulation recites:

For purposes of this suit, plaintiff does not dispute the amount of allocation * * * of the MIC [or GEIC] net operating loss for 1962 [or 1957, respectively] made to Canadian Branch operations by the Internal Revenue Service, but MIC does not stipulate that the Internal Revenue Service was legally correct in the allocation which it made of [those] * * * carryback(s) to "taxable income from Canadian sources" for purposes of computing the Section 904(a) limitation upon MIC's [or GEIC's] foreign tax credit for 1959 [or 1955, respectively].

We find in this language a fundamental concession that specific portions of net operating losses were realized in the endeavor to generate income from Canadian branch operations during the loss years. We see no reason why such losses should not therefore be attributed in specific part directly to income in the carryback years derived from the same sources. The situs of the assets giving rise to the loss ordinarily controls, as here. *Commissioner of Internal Revenue v. Ferro-Enamel Corp., supra; Torrington Co. v. United States, supra; Stockholms Enskilda Bank, supra; Royal Ins. Co., supra; De Nederlandsche Bank, supra.* The fact that the income against which the loss is deducted was generated in another taxable year is of no consequence. As we have observed, the purpose of the carryback provision is to do away with the rigors of the normal 1-year accounting span. *Libson Shops, Inc. v. Koehler, supra.* Section 862(b) and the cases convince us that direct allocation of these carryback deductions more accurately depicts income over the longer period from Canadian and American sources, respectively. We conclude that the net operating loss carryback deductions before us were properly allocated directly to the prior carryback year's income from the geographical sources which later engendered these losses.

Cases cited by plaintiff respecting allocation of current expenses to sources of current income for purposes of the foreign tax credit limitation do not lead to a contrary result. In *Missouri Pac. R. R. v. United States,* 392 F.2d 592, 183 Ct.Cl. 168 (1968), after establishing the credibility of a tax paid to Mexico, the court decided that in determining the correct numerator of the limitation fraction certain items of current expense were not directly allocable to income from Mexican sources. Rather, interest paid on purchase-money indebtedness for acquisition of coaches, property taxes applicable to such property, and other expenses were to be allocated ratably between United States and Mexican income. 392 F.2d at 603, 183 Ct.Cl. at 185. Taxpayer reads *Missouri Pac.* to stand for the proposition that a deduction cannot be

allocated directly to an item or class of gross income under section 862(b) unless it was incurred in the same taxable year as the year in which such income was earned. Using the court's words:

> * * * [W]e are concerned only with the following two classes of deductible expenses: (1) Those which are directly assignable to Mexico because they are directly attributable to and incurred in earning the rental income in Mexico; and (2) the Mexican portion of expenses which are not directly assignable to the income from either country and must, therefore, be allocated ratably between the two countries. [392 F.2d at 602, 183 Ct.Cl. at 183.]

The taxpayer reasons that a net operating loss deduction must be apportioned ratably in this case between Canadian and American income, since 1 year's loss cannot possibly be considered as "incurred" in earning the income of another year.

Plaintiff misapprehends the thrust of Missouri Pac. The cited passage merely characterizes the factual nature of the current expenses there involved, and does not state an ironclad rule of law dispositive in the case of a net operating loss carryback. Actually, we restated the general rule under section 119(d) of the 1939 Code (now section 862(b)) in the paragraph preceding that now relied upon by the plaintiff:

> * * * [I]f an expense or other deduction, or some part thereof, can be definitely assigned to gross income earned in either the United States or Mexico, then it should be so assigned and no proration is necessary * *. Those deductions which cannot reasonably be directly assigned to one country or the other should be allocated ratably between the two. * * *. [392 F.2d at 602, 183 Ct.Cl. at 183.]

As stated, we conclude in this case that the net operating loss carryback deductions are assignable in specific part *directly* to gross income earned in Canada, albeit income of a prior taxable year. Accordingly, we think that we have observed scrupulously the law as it is set down in *Missouri Pac.,* and restated in *Chicago, Milwaukee R. R. v. United States,* 404 F.2d 960, 186 Ct.Cl. 250 (1968).

### III.

In summary and conclusion, in our view a foreign tax credit limitation must be recomputed to reflect the impact upon taxable income of a net operating loss carryback deduction. Where possible, as upon the stipulation before us, such loss deduction should be allocated in specific part directly to income according to its geographical source. We think these rules to be in accord with the policies underlying the net operating loss carryback and foreign tax credit provisions. Taxable income as defined by the Code more accurately reflects the relative success or failure of the business over the business cycle. The credit is allowed, but in any event never to exceed the amount of United States income tax which would be due, absent the credit, in respect of taxable income from each geographical source. We think the defendant must prevail. The petitions are dismissed.