THE BLACK & DECKER CORPORATION, Petitioner, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Black & Decker Corp. v. Commissioner
Docket No. 10673-88
United States Tax Court
T.C. Memo 1991-557; 1991 Tax Ct. Memo LEXIS 605; 62 T.C.M. (CCH) 1204; T.C.M. (RIA) 91557; November 7, 1991, Filed *605 Decision will be entered for the respondent. P is a United States corporation operating worldwide in the business of manufacturing and selling power tools and other products. In 1972, P established a wholly owned subsidiary (NBD) in Japan to compete against the two major Japanese tool manufacturers in their home markets and to protect P's market share in the United States and worldwide. NBD operated at a loss for all but 2 years of its existence. NBD never declared or paid a dividend. P sustained a $ 7,883,132 worthless stock loss for its 1981 taxable year when its stock in NBD became worthless. The deficiency is attributable to respondent's determination that the worthless stock loss is entirely allocable to sources outside the United States for purposes of computing the foreign tax credit limitation under sec. 904. Held, petitioner's worthless stock loss is allocable to the dividend class of gross income. Sec. 1.861-8(a)(2), Income Tax Regs.Held further, the worthless stock loss is allocable against petitioner's foreign source income. Sec. 1.861-8(e)(7)(i), Income Tax Regs.
Herbert Odell and Joel C. Weiss, for the petitioner. Elizabeth S. Henn *606 and Clare J. Brooks, for the respondent. COLVIN, Judge. COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in the amounts of $ 818,321 for the taxable year ending September 25, 1977, $ 4,295,583 for the taxable year ending September 24, 1978, and $ 196,863 for the taxable year ending September 27, 1981. Petitioner has conceded all adjustments contained in the statutory notice of deficiency with the exception of the foreign tax credit adjustment made pursuant to section 904. [1]
Petitioner, Black & Decker Corporation, sustained a $ 7,883,132 worthless stock loss for the taxable year ending September 27, 1981, when petitioner's stock in a wholly owned foreign subsidiary became worthless. The sole issue for decision is whether the loss is a deduction from United States or foreign source income in computing *607 foreign source taxable income for purposes of the foreign tax credit limitation under section 904. We hold that the worthless stock loss is allocable against petitioner's foreign source income. FINDINGS OF FACT 1. Petitioner
Petitioner (formerly The Black & Decker Manufacturing Company and Subsidiaries) is a United States corporation with principal offices in Towson, Maryland. During its fiscal years 1977 through 1981 petitioner was in the business of manufacturing and selling power tools and other products. Petitioner filed consolidated United States corporate income tax returns (Form 1120) for the taxable years ending September 25, 1977 (the 1977 year), September 24, 1978 (the 1978 year), September 30, 1979 (the 1979 year), September 28, 1980 (the 1980 year), and September 27, 1981 (the 1981 year). During the early 1970s, petitioner operated worldwide, selling products in every market in the Free World and in a few markets behind the Iron Curtain. Petitioner operated through foreign subsidiaries or branches. Petitioner viewed itself as an effective competitor worldwide. Although petitioner's largest market share was in the United Kingdom, petitioner did substantially *608 more business in the United States. During the early 1970s petitioner controlled a substantial portion of the United States market for professional and power tools. 2. Background
In 1967, as a result of a market survey in Japan which indicated that there was considerable potential in the sale of Black & Decker products in that market, petitioner established a subsidiary to sell goods in Japan. The subsidiary was known as Black & Decker Limited (Japan) (hereafter, B&D (Japan)). It was incorporated in Maryland and was a wholly owned subsidiary of Black & Decker Limited, a United Kingdom company. B&D (Japan) operated a branch in Japan to sell Black & Decker products there. During the early 1970s, two major Japanese tool manufacturers, Makita and Hitachi, competed with petitioner in several markets in which petitioner operated. During those years, Makita and Hitachi each possessed 40 percent of the Japanese power tool market. Makita and Hitachi began to expand their selling operations outside of Japan. Makita and Hitachi had sales activities worldwide, including Europe, the United States, Canada, Australia, and Southeast Asia. In the early 1970s petitioner had significant *609 concerns about Makita and Hitachi gaining United States market shares in the power tool industry, thereby posing a substantial threat to petitioner's business, not only in the United States but worldwide. Petitioner maintained a significant data bank on its Japanese competitors to closely monitor their activities. 3. Petitioner's Establishment of its Japanese Subsidiary (NBD)
Before 1972, petitioner sold its products in Japan through B&D (Japan). In 1972, petitioner formed another wholly owned foreign subsidiary, Nippon Black & Decker (NBD), in Japan to manufacture, purchase, sell, import, export, and provide repair service for power tools and accessories and related component parts. Petitioner acquired all of the shares of NBD for $ 249,838. NBD began operations in 1974. NBD received approval from Japan's Ministry of International Trade and Industry (MITI) to build a manufacturing facility in Japan. The business plan presented to MITI anticipated that petitioner would obtain a 15 percent market share over the first 5 years. The approval granted by MITI was one of only a few approvals granted up to that time by MITI to a Japanese manufacturing corporation wholly owned *610 by an American company. NBD took over the functions of B&D (Japan), which was dissolved in 1975. In October 1974 petitioner made an additional investment in NBD which increased its basis by $ 633,299. In December 1974 petitioner invested an additional $ 3,000,000 in NBD. In 1979 petitioner transferred the NBD stock to Black and Decker, Incorporated (BDI), a wholly owned domestic subsidiary of petitioner, in a tax-free transaction. In 1980 BDI invested $ 4,000,000 in NBD. As a result of the investments in NBD, BDI's basis in NBD stock was $ 7,883,137. Because of NBD's continuing substantial losses in 1981 and petitioner's domestic financial reversals during the early 1980s, petitioner abandoned the NBD operations, liquidated the assets, and claimed a $ 7,883,137 worthless stock loss (the worthless stock loss), pursuant to section 165(g)(3) on its 1981 Federal income tax return. Respondent allowed petitioner's loss. The deficiency at issue is attributable to respondent's determination that the worthless stock loss was entirely allocable to sources outside the United States. Petitioner's purpose in investing in NBD was to protect its market share in the United States and worldwide. *611 Petitioner sought to achieve this purpose by competing aggressively with Makita and Hitachi in their home markets in Japan. Petitioner believed that competing with the Japanese companies in Japan would strengthen petitioner's ability to compete against their export activity to the United States and to other markets in which petitioner had sales operations. Petitioner did not expect to receive dividends from NBD at the time of its investments in the stock of NBD (1972, 1974, and 1980) because of NBD's losses. However, petitioner did intend to make a profit in Japan after establishing market share. NBD operated at a loss for all but 2 years of its existence. NBD never declared or paid a dividend. NBD maintained a deficit in its retained earnings beginning with its taxable year ending September 30, 1975. During the years in issue, all of NBD's business and assets were located in Japan. NBD operated solely in Japan and derived no United States source gross income on its sale of products or from any other activity during the years in issue. NBD had a substantial business operation in Japan, which consisted mainly of an assembly plant, distribution center, and sales operation. *612 Products sold by NBD were generally purchased from petitioner or its subsidiaries or were assembled by NBD from product parts purchased from petitioner or its subsidiaries. NBD maintained an assembly plant which employed Japanese workers and owned tooling equipment such as screwdrivers and riveters to assemble product parts. NBD did not own or operate any other manufacturing facilities in Japan during the years in issue. NBD owned no real property and operated in Japan in leased premises. NBD leased its main distribution center in Japan. It also leased a number of satellite distribution centers and other premises in Japan. NBD employed a sales force in Japan who sold to Japanese distributors who then distributed the products to the ultimate consumers. Petitioner's gross income from transactions with NBD for the 1981 year was as follows: Amount
Percentage
Gross Profit on Sales to NBD
$ 134,000
76.81
(U.S. Source)
Interest and Royalty Income
40,453
23.19
from NBD (Foreign Source)
During the 1981 year petitioner's gross income from United States and foreign sources and the percentages of its gross income from these sources, both calculated on a consolidated *613 basis, was as follows: Amount
Percentage
U.S. Source
$ 303,503,149
87.43
Foreign Source
$ 43,629,815
12.57
BDI had no gross income from the sales of inventory for the 1979, 1980, and 1981 years. OPINION The sole issue for decision is whether a loss from worthless stock in a wholly owned foreign subsidiary is deducted from U.S. source or foreign source income in computing the foreign tax credit limitation. Petitioner contends that the worthless stock loss is entirely allocable to sources within the United States. Alternatively, petitioner contends that a portion of the worthless stock loss is allocable to sources within the United States. Respondent agrees that petitioner is entitled to a worthless stock loss deduction under section 165(g)(3). However, respondent maintains that the deduction relates to petitioner's foreign source income and thus reduces taxable income from sources without the United States for purposes of the foreign tax credit limitation. 1. Foreign Tax Credit Limitation
Domestic corporations may elect a foreign tax credit for amounts paid or accrued as tax during the taxable year to a foreign country. Sec. 901. The credit is subject *614 to limitation by section 904. Section 904(a) provides that the total amount of the foreign tax credit "shall not exceed the same proportion of the tax against which such credit is taken which the taxpayer's taxable income from sources without the United States (but not in excess of the taxpayer's entire taxable income) bears to his entire taxable income for the same taxable year." Expressed as a fraction, the limitation on the foreign tax credit is as follows: Maximum Credit = U.S. tentative tax X Taxable income from source without the U.S. / Entire taxable income To compute the section 904 limitation we must decide the amount of petitioner's taxable income from sources outside the United States. 2. Foreign Source Income
Sections 861 through 863 provide rules for determining whether income is from sources within the United States (U.S. source income) or from sources without the United States (foreign source income). Section 861(a) provides rules for sourcing gross income from several specific classes within the United States. Section 862(a) provides rules for sourcing those classes of gross income without the United States. Section 863(a) authorizes the Secretary to *615 promulgate regulations for allocating gross income, expenses, losses, and deductions not specified in sections 861(a) and 862(a) to sources within or without the United States. Taxable U.S. source income is the sum of items of U.S. source gross income less expenses, losses, and other deductions properly apportioned or allocated thereto and less a ratable share of expenses, losses, or other deductions that cannot definitely be allocated to a class of gross income. Sec. 861(b). Taxable foreign source income is the sum of items of foreign source income less expenses, losses, and other deductions properly apportioned or allocated thereto, and less a ratable share of any expenses, losses, or other deductions which cannot be definitely allocated to a class of gross income. Sec. 862(b). Taxable income from sources without the United States is determined on the same basis as that used in section 1.861-8, Income Tax Regs., for determining the taxable income from sources within the United States. Sec. 1.862-1(b), Income Tax Regs.
Under sec. 1.861-8(a)(2), Income Tax Regs., a taxpayer is required to allocate deductions to a class of gross income, and then, if necessary, to apportion deductions *616 within the class of gross income between the statutory grouping of gross income (foreign source income) and the residual grouping of gross income (U.S. source income). Allocations and apportionments are made on the basis of the factual relationship of deductions to gross income. Sec. 1.861-8(a)(2) and 1.861-8(a)(4), Income Tax Regs. If the deduction is allocable to a class of gross income which is contained in both the statutory and residual grouping, the deduction must be apportioned between the statutory and residual grouping of gross income within that class. Sec. 1.861-8(c)(1), Income Tax Regs.
In determining the class of gross income to which a deduction is allocated, section 1.861-8(b)(2), Income Tax Regs., provides: (2) Relationship to activity or property. A deduction shall be considered definitely related to a class of gross income and therefore allocable to such class if it is incurred as a result of, or incident to, an activity or in connection with property from which such class of gross income is derived. Where a deduction is incurred as a result of, or incident to, an activity or in connection with property, which activity or property generates, has generated, *617 or could reasonably have been expected to generate gross income, such deduction shall be considered definitely related to such gross income as a class whether or not there is any item of gross income in such class which is received or accrued during the taxable year and whether or not the amount of deductions exceeds the amount of gross income in such class. * * * Section 1.861-8(e)(7)(i), Income Tax Regs., provides rules for allocation of losses on the sale, exchange, or other disposition of property. Such losses are considered definitely related and allocable to the class of gross income to which the property ordinarily gives rise. Section 1.861-8(e)(7)(i), Income Tax Regs., provides: (7) Losses on the sale, exchange, or other disposition of property -- (i) Allocation. The deduction allowed for loss recognized on the sale, exchange, or other disposition of a capital asset or property described in section 1231(b) shall be considered a deduction which is definitely related and allocable to the class of gross income to which such asset or property ordinarily gives rise in the hands of the taxpayer. Where the nature of gross income generated from the asset or property *618 has varied significantly over several taxable years of the taxpayer, such class of gross income shall generally be determined by reference to gross income generated from the asset or property during the taxable year or years immediately preceding the sale, exchange, or other disposition of such asset or property. * * * 3. Factual Relationship Approach v. Automatic Dividend Theory
Petitioner alleges that its purpose was not to generate dividend income but rather to protect and promote income from sales of its products in the United States, and that, accordingly, the stock loss is allocable to petitioner's U.S. source income from sales. However, we believe the record establishes that petitioner hoped to compete effectively against Japanese manufacturers in Japan and eventually to derive Japanese dividends. In addition, petitioner asserts that since its investment in NBD did not give rise to any foreign source dividends, the loss is properly allocable to petitioner's U.S. source income. Petitioner disagrees with respondent's argument that a loss on a stock investment is ordinarily allocable to the dividend class of income, noting that a stock investment also gives rise to *619 capital gain income. Petitioner claims this approach is antithetical to the application of section 1.861-8(e)(7)(i), Income Tax Regs. Petitioner interprets the regulation as relating the loss to the income ordinarily produced in the hands of the taxpayer. Petitioner characterizes respondent's position as tantamount to an automatic dividend approach under which an investment in stock automatically gives rise to income (or loss) in the dividend category. If an automatic dividend approach were intended, petitioner contends, the phrase "in the hands of the taxpayer" would have been wholly unnecessary. Respondent claims that petitioner misinterprets the regulations as providing a subjective test for allocating losses. Respondent maintains that the phrase "ordinarily gives rise" does not imply that the classification of income is determined by the intent of the taxpayer, and that the kind of income to which an asset ordinarily gives rise does not vary from taxpayer to taxpayer depending on their intent. Respondent argues that although a stock investment can yield capital gain income, an investment in stock in a wholly owned subsidiary ordinarily gives rise to dividend income in the *620 hands of the taxpayer. Respondent asserts that petitioner's investment in the NBD stock was an investment which would ordinarily have generated dividend income from sources without the United States, and that, under section 1.861-8(e)(7)(i), Income Tax Regs., the worthless stock loss is thus allocable to foreign source dividend income. Respondent also argues that the fact that petitioner's investment generated no dividend income does not preclude a finding that the class of gross income to which the loss should be allocated is dividend income from NBD. Sec. 1.861-8(b)(1)(2), 1.861-8(c)(1), and 1.861-8(d)(1), Income Tax Regs.
We believe the regulations require objective consideration of the facts and circumstances relating to the relationship of the worthless stock loss to the class of income to which the stock would ordinarily give rise in the hands of the taxpayer. Sec. 1.861-8(a)(2), Income Tax Regs.
Here, petitioner incurred a substantial worthless stock loss from its investment in NBD, its wholly owned foreign subsidiary. Although NBD did not pay or declare a dividend during the years of its existence, petitioner did contemplate taking profits from NBD once it established *621 market share. For example, the business plan presented to MITI anticipated that petitioner would obtain a 15 percent market share over the first 5 years. On the basis of the facts, we conclude that petitioner's investment in the stock of NBD would ordinarily give rise to dividend income; accordingly, the worthless stock loss is allocable to dividend income. 4. Investment Purpose Versus Geographical Situs Test
The parties make arguments based on the pre-1977 law relating to the treatment of worthless stock losses. For the sake of completeness we will address their arguments. Petitioner contends that losses are not sourced by the location of the property or activity giving rise to the loss, but rather by the economic relationship of these deductions to the taxpayer's income. Petitioner thus contends that the geographic situs test applied by the Sixth Circuit in Commissioner v. Ferro-Enamel Corp., 134 F.2d 564 (6th Cir. 1943), revg. a Memorandum Opinion of the Board of Tax Appeals dated Feb. 25, 1942, is erroneous and that the economic relationship approach adopted by the Board of Tax Appeals is correct. Respondent argues that although the analysis of *622 the Sixth Circuit in Ferro-Enamel is not the same as in the regulations under section 861, it leads to the same result in this case, that is, petitioner's worthless stock loss is allocable to foreign source income. We agree with respondent. In Commissioner v. Ferro-Enamel Corp., supra, the source of a loss was determined by the geographical situs of the property or activity that generates the loss. Under Ferro-Enamel, the worthless stock loss in the instant case would be allocated to foreign source income because the geographical situs of the property which generated the loss was in Japan. In Ferro-Enamel, the taxpayer was an Ohio corporation that purchased stock in a Canadian corporation to obtain a constant source of raw materials for its domestic business. The stock later became worthless when the Canadian corporation ceased operations. The sole issue was whether the taxpayer's worthless stock loss arose from sources within or without the United States for purposes of the foreign tax credit under section 131 of the Revenue Act of 1936, Pub. L. 740, ch. 690, tit. I, 49 Stat. 1648, 1696. The Board of Tax Appeals held that because the investment *623 was not made to obtain dividends from a foreign corporation but was made to enable the taxpayer to carry on manufacturing in the United States, the loss was properly allocable to sources of income within the United States. The Sixth Circuit reversed the Board of Tax Appeals, using a geographical situs test to determine the source of the loss. It stated: The statute in question undertakes to classify the sources of income within the United States and without the United States by the nature and location of the activities of the taxpayer or his property which produces the income. If the income be from service, the place where the service is performed is decisive. If the income is from capital, the place where the capital is employed is controlling. If the income arises from the sale of a capital asset or a loss from its disposition, the place where the sale occurs, or the loss happens, is decisive. [Commissioner v. Ferro-Enamel Corp., 134 F.2d at 566.] The Sixth Circuit recognized that the taxpayer had invested in the stock solely to obtain raw material for its domestic business and did not expect to receive dividends. However, it noted: this fact does *624 not convert the loss into a deduction from * * * [the taxpayer's] income from sources within the United States. The loss grows out of an activity or use of property and the situs of the loss is not transferred to the home of * * * [the taxpayer] because * * * [the taxpayer] wished to obtain a source of raw material. [Commissioner v. Ferro-Enamel Corp., 134 F.2d at 566.] In Korfund Co. v. Commissioner, 1 T.C. 1180 (1943), decided 1 month after Ferro-Enamel v. Commissioner, supra, we considered whether payments by a United States corporation to a nonresident alien and a foreign corporation in consideration for an agreement not to compete with the United States corporation, were income earned from sources within the United States. We followed Commissioner v. Ferro-Enamel Corp., supra; Sabatini v. Commissioner, 98 F.2d 753 (2d Cir. 1938), modifying 32 B.T.A. 705 (1935); Ingram v. Bowers, 57 F.2d 65 (2d Cir. 1932), and held that the situs of the right to compete was in the United States. The foreign corporation and alien gave up their rights to do business *625 in the United States for consideration payable in the United States. Thus the income received for those rights was from sources within the United States. Korfund Co. v. Commissioner, supra at 1187. In Theo. H. Davies & Co. v. Commissioner, 75 T.C. 443, 447 n.12 (1980), affd. 678 F.2d 1367 (9th Cir. 1982), the sole issue was the proper treatment of capital losses from sources without the United States in computing the overall foreign tax credit pursuant to section 904(a)(2). We noted that the agreement of the parties for sourcing the losses was consistent with case law that the location of the sale determines the source, citing Commissioner v. Ferro-Enamel Corp., supra, and Korfund Co. v. Commissioner, supra.
Finally, in Motors Insurance Corp. v. United States, 208 Ct. Cl. 571, 530 F.2d 864, 877 (1976), and Torrington Co. v. United States, 137 Ct. Cl. 622, 149 F. Supp. 172 (1957), the Court of Claims applied the rule of Ferro-Enamel that where a loss is realized in the endeavor to generate income from specific *626 geographical sources, in applying section 862(b) such losses may properly be applied in reduction of income from such geographical sources. Petitioner argues that the Sixth Circuit's opinion in Ferro-Enamel confuses two separate steps mandated by sections 214(b) and 234(b) of the Revenue Act of 1918, Pub. L. 254, 40 Stat. 1057, 1066, 1080, and section 119(d) of the Revenue Act of 1936, Pub. L. 740, 49 Stat. 1648, 1693-1694 (the predecessors of sections 861 through 863) which were subsequently amplified by section 1.861-8, Income Tax Regs. Under the statute and the regulations, expenses are allocated based on their factual relationship to a class of gross income. Petitioner contends, therefore, that the geographic location of expenses does not automatically determine how a loss should be allocated. Petitioner contends that its purpose in investing in NBD was to protect and promote its U.S. market shares, and that the worthless stock loss is allocable entirely to U.S. source income. Petitioner contends that even assuming the Sixth Circuit's opinion was correct, the opinion does not have any vitality after the adoption in 1977 of section 1.861-8, Income Tax Regs., placing the *627 emphasis on the factual connection between a class of gross income and the asset as used by the taxpayer. We reject petitioner's contention that the worthless stock loss is allocable to sources within the United States because the NBD stock was acquired to protect petitioner's U.S. market, a market which generated U.S. source income. Instead, we believe that using the geographical situs test of Commissioner v. Ferro-Enamel Corp., supra, produces a result here consistent with the 1977 regulations, and that petitioner's worthless stock loss from NBD is allocable to foreign source income because the loss sustained by petitioner grew out of an activity and use of property in Japan. 5. Allocation Method
Petitioner argues in the alternative that, pursuant to the factual relationship test of the regulations, its worthless stock loss should be allocated against the classes of gross income received by petitioner directly from NBD, i.e., gross profit on sales, interest income, and royalty income. Petitioner contends that allocating the worthless stock loss to the classes of income actually generated by NBD is consistent with section 1.861-8(e)(7), Income Tax *628 Regs.
Petitioner's position is that gross profit on sales to NBD generated U.S. source income, while interest and royalty income from NBD generated foreign source income for petitioner. Since under this analysis petitioner's loss would be allocable both to foreign source and U.S. source income, the loss must be apportioned between foreign source and U.S. source income in each of the three classes of income to which the worthless stock loss is allocable. Sec. 1.861-8(e)(7)(ii) and 1.861-8(c)(1), Income Tax Regs. Petitioner derived 76.81 percent of its gross income from sources within the United States and 23.19 percent from sources without the United States for the year ending September 27, 1981. Accordingly, petitioner maintains that 76.81 percent of the loss should be allocated against U.S. source income since it represents 76.81 percent of the total income from the three classes. Respondent disagrees with petitioner's characterization of section 1.861-8(e)(7), Income Tax Regs., as mandating that a loss is allocable solely to the classes of gross income generated by the asset. Respondent contends that it is clear that no income need be generated by the asset for the loss to *629 relate to a particular class of income. In addition, respondent notes that even if one looked to the income generated by the asset, here the stock of NBD, one would conclude that the asset generated no income for petitioner. Respondent further argues that under section 1.861-8(b)(2), Income Tax Regs., a deduction must be incurred as a result of, or incident to, an activity or in connection with property from which such class of gross income is derived. Respondent maintains that the gross income received by petitioner from its transactions with NBD was not income generated by the stock, and that it was not the ownership of the stock in NBD which gave rise to the income from sales, royalties, and interest to petitioner. Rather, respondent argues that these kinds of income resulted from transactions between petitioner and another entity and did not depend on the stock ownership by petitioner in NBD. Having found that petitioner's worthless stock loss is allocable to foreign source income under section 1.861-8(a)(2), Income Tax Regs., we conclude that the loss is not allocable between U.S. source and foreign source income by reference to the classes of gross income received by petitioner *630 directly from NBD. 6. Apportionment of Worthless Stock Loss
Alternatively, petitioner asserts that since dividends from NBD were never received, the worthless stock loss is not definitely related to any class of gross income and the loss should be apportioned on the basis of the respective ratios of petitioner's U.S. source and foreign source income to its total gross income for the year of the loss. Petitioner recognizes that section 1.861-8(b)(2), Income Tax Regs., states that a loss is allocated to a class of gross income even though the taxpayer realizes no gross income for that class during the year of the loss, but argues that it does not sanction the allocation of a loss to a class of gross income never realized or contemplated. Under section 1.861-8(b)(5), Income Tax Regs., losses which bear no definite relationship to any class of gross income are deemed to be allocable to all classes of the taxpayer's gross income. Petitioner next contends that if we determine that the loss is allocable to all of petitioner's gross income, the loss must be apportioned between petitioner's U.S. source and foreign source gross income based on the proportion that each bears to petitioner's *631 total gross income in accordance with section 1.861-8(e)(7)(ii), Income Tax Regs. Petitioner maintains that because 87.43 percent of petitioner's gross income was U.S. source gross income during the year of the loss, 87.43 percent of the loss is apportioned to U.S. source gross income and 12.57 percent of the loss is apportioned to foreign source income. Section 1.861-8(e)(7)(ii), Income Tax Regs., provides for apportionment of losses on the sale of property, but only under "unusual circumstances," such as when an intangible asset is used both within and without the United States, or gross income is attributable to a tangible asset used both within and without the United States. Sec. 1.861-8(e)(7)(ii), Income Tax Regs.
We are not convinced that apportionment under this provision is justified in this case. We note that the regulations favor the identification of categories of gross income to which deductions are "definitely related," section 1.861-8(b)(2), Income Tax Regs., and do not favor the placement of deductions in the "not definitely related" category. Sec. 1.861-8(b)(5) and 1.861-8(e)(9), Income Tax Regs. We do not allocate the worthless stock loss to all of petitioner's *632 gross income because the loss bears a definite relationship to petitioner's foreign source dividend income. To reflect the foregoing, Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code as amended and in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩